[Cite as *State v. Dillon*, 2016-Ohio-1561.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2014-CA-36 |
| | : | |
| v. | : | Trial Court Case No. 12-CR-362 |
| | : | |
| RYAN DILLON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of April, 2016.

. . . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

DANIEL R. ALLNUTT, Atty. Reg. No. 0085452, 3420 Atrium Boulevard, Suite 160, Middletown, Ohio 45005
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Ryan Dillon appeals from his conviction and sentence on charges of

aggravated murder, evidence tampering, and receiving stolen property.[1]

{¶ 2} Dillon advances nine assignments of error. First, he challenges the trial court's decision to admit into evidence a letter written by his mother, the murder victim, three years prior to her death. Second, he claims the trial court erred in admitting improper character evidence and irrelevant prior bad acts. Third, he contends the trial court erred in overruling his motion for a mistrial. Fourth, he alleges ineffective assistance of trial counsel. Fifth, he asserts that the State presented legally insufficient evidence to sustain his aggravated-murder conviction. Sixth, he argues that the aggravated-murder conviction is against the manifest weight of the evidence. Seventh, he alleges a violation of his right to a speedy trial. Eighth, he claims the trial court improperly overruled his pretrial motion to suppress. Ninth, he asserts that cumulative error deprived him of a fair trial.

{¶ 3} The present appeal stems from the murder of Dillon's mother, Vicky Burks, in May 2012. At the time of her death, Mrs. Burks resided in Clark County with 25-year-old Dillon and her husband, Marty Burks, who was Dillon's step-father. At trial, the State presented evidence that Dillon had a troubled and contentious relationship with his mother and step-father. On May 8, 2012, he took the Burks' truck without permission. When he returned home that evening, a "[v]ery intense" argument ensued. (Trial Tr. at 850). As the argument continued, the Burks locked their bedroom door and went to bed. Dillon continued screaming and "pounding" on the door. (*Id.* at 851). He eventually walked away, and the Burks went to sleep. (*Id.*).

---

[1] A jury also found Dillon guilty of purposeful murder and felony murder. Those verdicts were merged into the aggravated murder as allied offenses at sentencing.

{¶ 4} The following morning, Mr. Burks left for work around 6:30 a.m. Before leaving, he heard Dillon laughing to himself in his bedroom. Mrs. Burks was still in bed when Mr. Burks left. (*Id.* at 853). Mr. Burks returned home for lunch around 11:35 a.m. He looked for his wife but did not see her anywhere. Dillon was home, however, and he told Mr. Burks that Mrs. Burks was out shopping with her sister. (*Id.* at 853). Mr. Burks accepted that response and proceeded to make a sandwich. When he finished eating, Dillon told him, "I wish you hadn't told mom about the truck." (*Id.* at 854). Mr. Burks responded by telling Dillon that he was going to sell the truck. (*Id.* at 855).

{¶ 5} Mr. Burks returned home again after work at around 3:15 p.m. At that time, he noticed that his truck was gone again. He also could not find Mrs. Burks, with whom he had plans to attend a recital at 5:30 p.m. (*Id.* at 856). Mr. Burks called his wife's sister, who reported that Mrs. Burks was not with her. (*Id.* at 857). While trying to locate his wife, Mr. Burks discovered small spots of blood in the bathroom. He attributed them to his wife's skin condition and wiped them up. (*Id.* at 857). He also noticed a load of Dillon's wet clothes in the washing machine and found a "soaking wet" blanket in the dryer. (*Id.* at 858).

{¶ 6} After being unable to locate his wife, Mr. Burks eventually called 911. Clark County sheriff's deputy Steven Elliott was the first officer to arrive shortly after 6:00 p.m. Elliott spoke with Mr. Burks and conducted a walk-through of the house. He observed brownish-colored stains on the wet blanket. (*Id.* at 236). He also saw apparent blood spots or blood stains in the kitchen and bathroom and what appeared to be blood spatter in a mud room. (*Id.* at 237, 239). At that point, Elliott called for assistance.

{¶ 7} Additional officers and investigators arrived shortly thereafter. They found

blood primarily in the kitchen and in the adjacent mud room. Using a flashlight, they found blood spatter in the kitchen and bloody "drag marks" leading from the kitchen into the mud room. Investigators opened a trap door that had been covered with various items in the mud room and saw a stairway leading into a cellar. They saw what appeared to be brain tissue on the steps and found Mrs. Burks' body in a pool of blood at the bottom of the steps. (*Id.* at 349). Her skull had been badly fractured. (*Id.* at 356-357). The injuries were consistent with severe blunt-force trauma. (*Id.*). Although no murder weapon was found, Mr. Burks noticed that a baseball bat was missing from the mud room. (*Id.* at 863-864).

{¶ 8} While processing the scene, investigators tested spots on items of clothing and towels in the washer and dryer. Several of them tested presumptively positive for the presence of blood. Most of the items ultimately were found unsuitable for DNA identification, possibly because laundry detergent tends to degrade DNA. (*Id.* at 573, 577-578). Of significance, however, investigators found multiple blood spots on one of Dillon's t-shirts that had been taken from the dryer. Testing established that Mrs. Burks' DNA was found in one of the spots and that the odds of that particular DNA profile being found in another unrelated individual were one in 47 quintillion, 390 quadrillion. Testing of another blood spot on the same t-shirt revealed the presence of a partial DNA profile that was consistent with being Dillon's. The odds of that particular DNA profile being found in another unrelated individual was one in 240,100. (*Id.* at 567-570, 603-604, 612). Investigators also found a blood spot on a pair of Mr. Burks' shorts. Testing of that blood spot revealed a DNA mixture that was consistent with Mrs. Burks being the major contributor and Mr. Burks being the minor contributor. (*Id.* at 573). An explanation for this mixture was that Mrs. Burks' blood had dripped on the shorts, which previously had been

worn by Mr. Burks. (*Id.* at 575).

{¶ 9} Around 2:30 p.m. on May 9, 2012, the day of Mrs. Burks' murder, three counties away, Auglaize County sheriff's deputy Donald Roop made a traffic stop of the Burks' truck. Dillon was driving the truck, which had a cap on the back and was headed west on U.S. Route 33 toward the Indiana-Ohio state line. Roop allowed him to proceed once the traffic stop was completed because "nothing came back as suspicious" when Roop checked Dillon's license and registration with the dispatcher. (*Id.* at 1065-1072). It was not until later that evening that police investigating Mrs. Burks' disappearance issued a "BOLO" for Dillon and the truck. (*Id.* at 257-258).

{¶ 10} Police located Dillon the following day near the Illinois-Wisconsin border. (Id. at 908). Raymond Clark, a detective in Wisconsin, initially saw Dillon's truck pulled off of the side of the road and parked around 10:00 p.m. (*Id.* at 914). There were no license plates on the truck and there was no cap on the back. (*Id.* at 915). Clark ran the truck's VIN and discovered that it had been reported stolen out of Ohio. (*Id.*). Clark and his companion then approached Dillon, who was seen walking on the roadway nearby. Dillon identified himself as "Aaron Adams." (*Id.* at 917). He had a cut or abrasion in the facial area, but he did not appear to have been in a traffic accident. (*Id.* at 954). He also had "superficial scratches" on his forearm. (*Id.* at 450). The truck appeared to have been driven into a ditch off of the road. (*Id.* at 945). Police searched the truck and found, among other things, a prescription made out to Ryan Dillon as well as a piece of paper with the name "James Adams" written on it several times. (*Id.* at 969-970). Testing revealed the presence of blood spots on a sweatshirt and a blood spot on one of the shoes Dillon was wearing when police apprehended him in Wisconsin. (*Id.* at 445, 483, 516-517, 555, 924,

926). The blood on the sweatshirt was Dillon's own blood. (*Id.* at 563, 600). The blood on the shoe failed to yield enough DNA to establish a profile. (*Id.* at 563).

{¶ 11} Dillon was "evasive" with police. (*Id.* at 984). Wisconsin police eventually obtained a booking photograph of Dillon from Clark County and discovered his true identity as well as the fact that he was wanted in Ohio in connection with a homicide investigation. When they confronted him with that information, he "became angry" and "insisted that his name was Aaron Adams." (*Id.* at 990). Dillon claimed to have been from the Lake Geneva or Milwaukee area of Wisconsin. (*Id.* at 991). After being arrested, he initially told police in Wisconsin that he had left Ohio on May 6th or 7th. He later stated that he had left Ohio on May 3rd. (*Id.* at 1091-1092). The State presented evidence, however, that Dillon had visited psychiatrist Linda Griffin in Urbana, Ohio, shortly before noon on May 7th and had received a prescription from her that same day. (Id. at 1146-1153). As noted above, he also had been subject to a traffic stop in Auglaize County on May 9th. The State also presented evidence that he had used a computer in the Burks' home in the early morning hours of May 9, 2012. . (*Id.* at 792-794).

{¶ 12} Following a five-day trial, a jury found Dillon guilty of aggravated murder (prior calculation and design) for killing his mother. The jury also found him guilty of purposeful murder and felony murder in connection with his mother's death. Finally, the jury found him guilty of receiving stolen property for taking the truck and evidence tampering for cleaning up the bloody crime scene and washing his clothes. The trial court merged the three murder charges at sentencing, and the State elected to proceed on aggravated murder. The trial court elected to sentence Dillon to life without the possibility

of parole for that offense. It imposed concurrent prison terms of 18 months for receiving stolen property and three years for evidence tampering. This appeal followed.

{¶ 13} In his first assignment of error, Dillon contends the trial court erred in admitting into evidence a letter his mother had written to the trial court in connection with a 2009 criminal case involving him.[2] Dillon objected to the State's use of the letter in a pretrial motion in limine. He also objected to the letter at trial. He argued, among other things, that the letter constituted inadmissible hearsay. The trial court overruled his objections and permitted Mrs. Burks' letter, which was authenticated by Mr. Burks, to be read and admitted into evidence. As read to the jury, the letter stated:

> Honorable Judge, we write you this letter to help you understand our situation. Ryan Dillon is our son, and we have a troubling situation. We have had problems with Ryan since middle school, around twelve years old. We have tried everything to help him. We let Ryan come home, and it has been a nightmare for us.

> Ryan is disrespectful, a bully, and has mental and maybe drug problems. *He threatens us daily. He says if he goes back to jail, when he comes back, he will kill us* or burn the house down. He is our son, and we don't want to ruin his life or future, but he's not trying to help himself.

> We try to make him—I can't make out the word—but he won't leave. He sleeps in our boats, motor home, or barn. We told Ryan we would not

---

[2] The record does not reveal whether this communication may have been a victim impact statement or the context of its presentation at that time. We therefore do not address whether there may be some alternative argument for its admission.

put up with the way he was when he left, and he could not be around Kenan Perkins.

Kenan was the first person he called as soon as he got home. We checked the phone numbers of whom he called. Ryan, and we think Kenan, has taken Marty's truck out on several occasions. We have to sleep with our wallets and purses with us.

Ryan's brother Jason has tried to help Ryan. He helped get Ryan enrolled in the Cincinnati Art Institute. Ryan wanted his dad to pick him up every weekend because he was having problems getting along with people in Cincinnati.

Ryan does not take responsibility for any of his actions. He blames me daily for everything that has happened to him.

Ryan took Marty's stepdad's truck out again on July 3rd while we were out. We came home around 11:00 p.m. and found the truck gone. Marty and I went looking for the truck and was talking things over about what to do. We felt if we kept letting Ryan get away with so much, it was not helping the situation. The police was called.

We have not seen any improvement. I am sure Ryan is not being honest with them. He doesn't think he does anything wrong. Ryan is defiant and disrespectful. We are really having a tough time because he is our son, *but we feel our safety is a concern*. Sincerely, Vicky and Marty Burks.

(Emphasis added) (Trial Tr. at 1056-1058).

{¶ 14} At trial, Mr. Burks testified that Dillon had a history of taking his truck without permission. (*Id.* at 826). He discussed one particular incident in July 2009 when he and his wife had returned home from dinner to find the truck gone. After concluding that Dillon had taken it, they called the police. They proceeded to meet an officer at a bowling alley and to accompany him back to their house. (*Id.* at 829-830). When they returned home with the officer, they found that the truck had been returned and that Dillon was in bed asleep. (*Id.* at 831). Although Dillon was not arrested for taking the truck in 2009, the officer who responded to the home discovered that Dillon had an outstanding warrant and arrested him for that reason. (*Id.*).

{¶ 15} The State argued at trial that the circumstances preceding Mrs. Burks' death on May 9, 2012 were similar to those that had occurred in July 2009. As set forth above, Dillon took the Burks' truck without permission on May 8, 2012. A heated argument occurred that night when he returned home. The State presented evidence that on the morning of May 9, 2012, Dillon accessed his computer and discovered he had a warrant for his arrest in Clark County. (*Id.* at 792-794). The State's theory was that he knew his mother was angry about him taking the truck, that he was afraid the police might become involved again as they had in 2009, and that he would go to jail on the outstanding warrant. In this context, the State purportedly used Mrs. Burks' 2009 letter to show Dillon's motive for killing her on July 9, 2012. In his closing argument, the prosecutor stated:

> We know at 7:58 Ryan Dillon is awake in that house. Again, from [expert witness] Branden Hoilt will tell you Ryan is on that computer again under password protected user ID profile of Arian [sic], and at 7:58 he's on that Clark County Municipal checking his own name to see if he has any

warrants.

That's very important that he's doing it that specific time because from the 2009 incident we know that Ryan was not going to go back to jail; and he associated jail with him stealing that truck, and he knew how mad his mom was and he knew in 2009 when she was mad, he went to jail and on May 9, 2012 he was not gonna go back to jail for that truck.

Again, when you go back to that 2009 incident Vicky Burks knew what Ryan Dillon was going to do. She puts in her letter that he threatens us daily. He says if he goes back to jail, when he comes back, he will kill us. He will kill us.

Vicky Burks knew way before this that he was going to kill her. Yet she took him back in. That love of that mother.

(*Id.* at 1200).

{¶ 16} The State also relied on Mrs. Burks' 2009 letter to establish that Dillon acted with prior calculation and design when he killed her. In his closing argument, the prosecutor stated:

And the prior calculation and design shows that Ryan Dillon May 9, 2012 at 7:58 in that morning and he was in that house on that computer and his mind was thinking, do I have a warrant.

Again, it goes back to that had (sic) 2009 incident. Am I going to go to jail again because mom now knows I took that car again.

He's looking up that warrant and what does he find? He finds on that date that he has a warrant out for his arrest. He knew right then when he

was in that bedroom on his computer looking up his name, he knew right then that he was not going to go back to jail.

Vicky Burks knew that; she wrote it in her letter. Ryan Dillon knew that; he was not going to allow that to happen again.

* * *

Again, aggravated murder. The elements you're going to have to look at. On May 9, 2012 here in Clark County, Ohio, Ryan Dillon did purposely with prior calculation and design cause the death of his mother. And that question is going to be that prior calculation and design, and I would submit to you, ladies and gentlemen, the evidence suggests that prior calculation and design. And that prior calculation and design probably went all the way back to 2009 when he knew him [sic] associated with taking that vehicle with him going to jail. We see in the early morning hours of 7:58 a.m. he's checking to see that he doesn't have a warrant, and he sees that he has a warrant.

At that point, ladies and gentlemen, at 7:58 in the morning Ryan Dillon makes the conscious decision, I am not going to go back to jail. He goes downstairs. Makes the conscious decision to get that bat. He makes the conscious decision to walk up behind his mom, and he makes the conscious decision to use that bat to strike and kill his mom.

This is not a spur of the movement (sic) crime, ladies and gentlemen. This is something Ryan Dillon knew he was going to do because he was

not going to be taken back to jail. His mom knew that too. She wrote it down:

If he goes back, he's told us he will kill us. Prior calculation and design.

(*Id.* at 1212-1213, 1233-1234).

{¶ 17} On appeal, Dillon argues, among other things, that Mrs. Burks' 2009 letter constituted hearsay not subject to any hearsay exception and not admissible for any non-hearsay purpose. In response, the State focuses on the portion of the letter in which Mrs. Burks mentioned being fearful and Dillon threatening to kill her and her husband if he went back to jail. The State argues that this portion of the letter satisfied the hearsay exception in Evid.R. 803(3) as a statement of her then-existing state of mind. The State further argues that "the letter should be construed as non-hearsay" because it was used to establish Dillon's motive rather than for the truth of the matter asserted. According to the State, the letter established his motive to kill his mother.

{¶ 18} We review rulings regarding hearsay under an abuse-of-discretion standard. *State v. Williams*, 2d Dist. Montgomery No. 26369, 2016-Ohio-322, ¶ 17. "A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable." Upon review, we conclude that the trial court acted unreasonably, and thus abused its discretion, when it allowed Mrs. Burks' letter to be read to the jury and admitted into evidence.

{¶ 19} We agree with Dillon that the key statement attributed to him in the letter was hearsay, which Evid.R. 801(C) defines as "a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." Mrs. Burks' letter was a written statement, she did not testify at trial, and we conclude that the letter was offered to prove the truth of the matter asserted. With

regard to the last conclusion, we reject the State's argument that the letter was admissible as non-hearsay because it was used to establish Dillon's "motive."

**{¶ 20}** It is true that an otherwise-inadmissible statement sometimes can be used for the non-hearsay purpose of establishing a defendant's motive for killing. In such a case, the statement is not hearsay because it is not used to prove the truth of the matter asserted. In *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, for example, the victim told the defendant: "I'm going to go to the police. I'm going to file charges." *Id.* at ¶ 119. The "matter asserted" was that the victim "intended to report something * * * to the authorities and to file charges concerning the matter." *Id.* The Ohio Supreme Court reasoned that the State did not introduce the victim's statement for the purpose of showing that he "*actually intended* to file charges." *Id.* at ¶ 120. The victim's intent in that regard was irrelevant to the defendant's guilt. *Id.* Instead, the statement was relevant to prove the defendant's motive in killing the victim. The statement was relevant because the victim made it to the defendant, regardless of whether it was true. *Id.* at ¶ 121. It was used to show that the defendant *believed* the victim would file charges and that he killed the victim for that reason. *Id.* at ¶ 122-125. Because the victim's statement was not introduced to prove the truth of the matter asserted, it was not hearsay. *Id.* at ¶ 125.

**{¶ 21}** The present case is distinguishable from *Osie*. The key statement by Dillon repeated in Mrs. Burks' 2009 letter *was* introduced to prove the truth of the matter asserted. Indeed, the statement that Dillon had threatened to kill the Burks if he went back to jail helped to establish his motive for killing Mrs. Burks *only if it was true*. Unlike *Osie*,

the statement was not introduced to show some effect it had on Mrs. Burks. Rather, it was introduced to show why Dillon carried out his own threat. The statement could achieve that objective, of course, only if Dillon's threat was true. Because Dillon's statement about threatening to kill Mrs. Burks if he went back to jail was introduced through her hearsay letter to prove the truth of the matter asserted, it remained hearsay even though it also perhaps went to the issue of motive.[3]

{¶ 22} We turn next to whether the letter satisfied a hearsay exception under Evid.R. 803(3) as a declaration of Mrs. Burks' then-existing state of mind. "A victim's hearsay statements that she feared the defendant are admissible under Evid.R. 803(3) as declarations of the declarant's then-existing state of mind or emotion." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 219. To be admissible, however, "such hearsay testimony must still be relevant to the issues in the case." *Id.*

{¶ 23} Here very little of Mrs. Burks' 2009 letter addressed her then-existing state of mind or emotion. Most of it discussed her long-standing troubles with Dillon and his prior bad acts. The letter did indicate, however, that she felt threatened by him and feared for her safety. Although these aspects of the letter went to her then-existing state of mind, the fact that she felt threatened and afraid was not relevant to any issue in the present case against Dillon. We fail to see how the fact that Mrs. Burks feared her killer was probative of his guilt or innocence.

---

[3] We say "perhaps" because Dillon did not actually go back to jail before killing Mrs. Burks. In her letter, Mrs. Burks reported that he had threatened to kill her upon returning from jail if he went there again. We recognize, however, that Dillon learned of a warrant for his arrest on the morning before Mrs. Burks' murder and, therefore, presumably believed that he would be going back to jail. This factual situation is close enough to the threat in his letter to support an argument that the letter helped establish a motive.

{¶ 24} In this regard, the present case is distinguishable from cases where state-of-mind evidence has been found relevant and admissible under Evid.R. 803(3). In *Adams*, for example, the defendant was charged with a capital specification alleging that he had committed murder in the course of a rape. The State used DNA evidence to show sexual conduct, and it used hearsay evidence that the victim had expressed fear of the defendant just hours before the sexual conduct to prove lack of consent. *Adams* at ¶ 218-220. In that context, the hearsay evidence was relevant and admissible under Evid.R. 803(3). Unlike *Adams*, the State has not identified the relevance to any material issue of Mrs. Burks' fear of Dillon in 2009. Therefore, no part of the letter was admissible as an expression of her then-existing state of mind or emotion.

{¶ 25} We also have considered whether some portion of the letter might have been admissible under any other hearsay exception. The present-sense impression exception under Evid.R. 803(1) briefly mentioned in the State's brief does not apply, however, because it only covers "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter * * *." Nothing in Mrs. Burks' letter satisfies this requirement. We also agree with Dillon that the forfeiture-by-wrongdoing exception in Evid.R. 804(B)(6) does not apply as it involves "[a] statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." There is no evidence that Dillon killed his mother for the purpose of preventing her from testifying against him. In short, we have not identified any evidentiary rule that would permit Mrs. Burks' letter to be read to the jury and admitted into evidence. Therefore, we hold that the trial court acted unreasonably, and abused its

discretion, in allowing the letter to be read and admitted.

{¶ 26} The remaining question is whether the trial court's erroneous evidentiary ruling constituted harmless error. "An error in the admission of evidence is not grounds for granting a new trial or for setting aside a verdict unless such action affected the outcome of the case." *State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835, ¶ 48. To find that an error in the admission of evidence does not require reversal, we must conclude that it was harmless beyond a reasonable doubt in view of the other evidence in the record. *State v. Dean*, Ohio Slip Opinion No. 2015-Ohio-4347, ¶ 125, citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153.

{¶ 27} With regard to Dillon's aggravated-murder conviction, we cannot say that the trial court's erroneous ruling regarding Mrs. Burks' letter was harmless beyond a reasonable doubt. To convict Dillon of aggravated murder, the State was required to prove that he acted with prior calculation and design when he killed his mother. As set forth above, the State relied primarily on two pieces of evidence to establish that fact: (1) Mrs. Burks' letter in which she repeated Dillon's threat to kill her if he went back to jail; and (2) Dillon's computer activity shortly before her murder during which he discovered a warrant for his arrest. Standing alone and unaccompanied by the conditional threat conveyed in the letter, Dillon's discovery of a warrant is not nearly as damaging to him on the issue of prior calculation and design. The letter placed his discovery of the warrant in context and magnified its significance. Without the letter, it is questionable whether the remaining evidence established prior calculation and design. Therefore, allowing the letter to be read to the jury and admitted into evidence was not harmless error as to the aggravated-murder conviction, which must be reversed.

{¶ 28} We note, however, that the jury also found Dillon guilty of purposeful murder and felony murder. The trial court merged those offenses into the aggravated murder as allied offenses, and the State elected to proceed to sentencing on aggravated murder. Having concluded that the aggravated-murder conviction must be reversed, we must consider whether the trial court's erroneous evidentiary ruling about Mrs. Burks' letter was harmless error as to the purposeful-murder and felony-murder verdicts. Because those two types of murder do not require a finding of premeditation and deliberation, and because the other evidence in the record establishes Dillon's guilt beyond a reasonable doubt, we conclude that admission of the letter was harmless error with respect to the guilty verdicts for purposeful murder and felony murder.

{¶ 29} In reaching the foregoing conclusion, we acknowledge that the evidence against Dillon was circumstantial insofar as no one saw him kill his mother. It is well settled, however, that direct and circumstantial evidence both "possess the same probative value." *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749. Moreover, after excluding Mrs. Burks' letter, the remaining evidence strongly points to Dillon's guilt. The day before her death, he had a heated argument with her about his unauthorized use of the family's truck. The following morning, Mr. Burks went to work, leaving Dillon and his mother together in the house. When he returned home for lunch, Mr. Burks inquired about his wife's whereabouts. Dillon falsely responded that she was out shopping with her sister. He also said he wished Mr. Burks had not told his mother about his use of the truck. When Mr. Burks later returned home after work, the truck was gone. Dillon's still-wet, freshly-washed clothes were found in the laundry room, along with a freshly-washed blanket and towels. Various items taken from the washer and dryer tested presumptively

positive for the presence of blood. Mrs. Burks' DNA was found in a blood spot on one of Dillon's t-shirts. His DNA was found in a separate blood spot on the same shirt. Mrs. Burks' body was found in a pool of blood hidden in a cellar underneath a trap door that had been covered with assorted items.

{¶ 30} The following day, police located Dillon and the missing truck in Wisconsin. The license plates and a truck cap had been removed. Dillon falsely identified himself as "Aaron Adams" and insisted he was from Wisconsin. Testing revealed the presence of Dillon's own blood on his sweatshirt and an unidentified blood spot on one of his shoes. He was evasive with police and became angry when they confronted him with his true identity and the fact that he was wanted in Ohio in connection with a homicide investigation. He falsely claimed that he had not been in Ohio since May 3, 2012 despite the fact that he had been subjected to a traffic stop in Auglaize County on May 9, 2012, the day of his mother's murder. He also had obtained a prescription in Ohio on May 7, 2012, and had used a computer in the Burks' home on May 9, 2012.

{¶ 31} In short, the record reflects that Dillon lied to Mr. Burks concerning Mrs. Burks' whereabouts shortly after the murder, tried to clean up the crime scene, hid her body, fled Ohio, and lied to investigators in Wisconsin after abandoning the truck and removing the plates. In light of this evidence, we find that the admission of evidence about his mother's letter was harmless beyond a reasonable doubt and did not influence the jury's verdict on the purposeful-murder and felony-murder charges. Therefore, it did not prejudice Dillon with respect to those charges.

{¶ 32} We sustain his first assignment of error, however, insofar as it relates to the aggravated-murder charge on which he was found guilty and sentenced. Based on the

reasoning set forth above, we hold that allowing the letter to be read to the jury and admitted into evidence was not harmless error as to the aggravated-murder conviction, which will be reversed.

{¶ 33} In his second assignment of error, Dillon contends the trial court erred in allowing certain character and bad-acts evidence to be used against him at trial. In particular, he complains about the introduction of: (1) evidence that he had viewed pornography on the internet and had several white-supremacist screen names; (2) journal entries purportedly written by him containing threats and violent imagery; and (3) evidence of a misdemeanor assault charge against him as well as a computer "screen shot" of the court's docket entry in that case.

{¶ 34} Dillon argues that each of the foregoing items should have been excluded from trial under Evid.R. 404(B), which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. Under the rule, such evidence may be admissible to prove things like "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The challenged evidence must be relevant to one or more of these things, which themselves actually must be at issue. *State v. Johnson*, 2d Dist. Montgomery No. 23508, 2011-Ohio-1133, ¶ 89; *State v. Sims*, 191 Ohio App.3d 622, 2010-Ohio-6228, 947 N.E.2d 227, ¶ 15 (2d Dist.). Even if the other-acts evidence is relevant to an issue in the case, its probative value must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Evid.R. 403(A). We note that the admission of prior-bad-acts evidence under Evid.R. 404(B) "lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse

of discretion that has created material prejudice." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

**{¶ 35}** With the foregoing standards in mind, we conclude that the trial court acted unreasonably, and therefore abused its discretion, in admitting evidence that Dillon had viewed pornography on the internet and used white-supremacist screen names. Cyber-crimes investigator Brandon Hoyt testified about his discovery of screen names such as "Nazi," "Hit1er," and "Aryan" on a home computer used by Dillon. (Trial Tr. at 765-766). He also testified about the computer being used to access pornography between 2:42 a.m. and 2:46 a.m. on May 9, 2012. (*Id.* at 788-789). The State argues that the foregoing testimony was admissible because it refuted Dillon's claim to Wisconsin police that he had not been in Ohio on May 9, 2012. In other words, it showed his opportunity to commit the murder.

**{¶ 36}** The State could have made the same point, however, by having Hoyt testify more generally that someone using screen names linked exclusively to Dillon had accessed the internet on the computer in the early morning hours of May 9, 2012. We see no reason why Hoyt had to disclose the actual names or to identify the nature of the web sites visited. The white-supremacist screen names and the pornographic nature of the web sites were not relevant to any material issue in the case and were unfairly prejudicial. We note, however, that Dillon's attorney did not object during trial when Hoyt testified. Therefore, we are limited to plain-error review under this assignment of error.[4]

---

[4] Dillon raises counsel's failure to object under his fourth assignment of error, *infra*, as ineffective assistance of counsel.

An error qualifies as "plain error" only if it is obvious and but for the error, the outcome of the proceeding clearly would have been otherwise. *State v. Desbiens*, 2d Dist. Montgomery No. 22489, 2008-Ohio-3375, ¶ 17. Although the testimony about Dillon using white-supremacist screen names and accessing pornography obviously should not have been admitted, we are unconvinced, based on our review of the entire record, that the outcome clearly would have been different if that evidence had been excluded. Accordingly, we find no plain error.

{¶ 37} Dillon next challenges testimony about journal entries in a notebook found in the Burks' home. At trial, Mr. Burks identified the handwriting in the notebook as Dillon's. (Trial Tr. at 844-845). Defense counsel objected to the journal entries on the basis of relevance and on the basis that any probative value was outweighed by the prejudicial effect. (*Id.* at 841, 1050). The State argued that the entries showed Dillon's rage and hatred of his mother and, therefore, helped establish a motive for killing her. (*Id.* at 841). The trial court overruled the objection and found the entries admissible. (*Id.* at 842, 1051).

{¶ 38} Although the issue is perhaps close, we see no abuse of discretion in the trial court's ruling. Several entries were read to the jury. From the context, it is apparent that the graphically violent and bizarre entries were primarily about Mrs. Burks. They contained sexually-explicit expressions of his hate-filled rage directed toward her. They also contained a threat by Dillon about "ending it for both of us" if she tried to ruin his life. (*Id.* at 1051-1054). Contrary to Dillon's objection below, we believe the entries were relevant to his relationship with his mother, his state of mind, his motive, and, perhaps, whether he acted with prior calculation and design. Having reviewed the entries, we

conclude that they are probative of whether he viciously beat her in the head with a baseball bat, as alleged by the State at trial. Although the entries are prejudicial to Dillon, the trial court had the discretion to conclude that the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

{¶ 39} Finally, Dillon challenges the admission of evidence about a misdemeanor assault charge against him. Specifically, through the testimony of a detective, the State introduced a computer "screen shot" from Clark County Municipal Court showing the charge against Dillon. (*Id.* at 1055-1056). Defense counsel made a non-specific objection, which the trial court overruled. (*Id.* at 1055). We note, however, that cyber-crimes investigator Hoyt already had identified and testified about the screen shot of the assault charge, without objection, when discussing Dillon's computer activity shortly before the murder. (*Id.* at 792-793). As set forth above, Dillon had learned during an internet search at 7:58 a.m. on May 9, 2012 that a warrant had been issued for his arrest in the assault case. (*Id.* at 792-794, 1136, 1213). The State's theory was that he killed his mother sometime later that day. We see no plain error in the trial court allowing Hoyt to testify about the screen shot and the misdemeanor charge,[5] and the detective's subsequent testimony to the same effect was merely cumulative. The second assignment of error is

---

[5] We note that evidence about the pending assault case against Dillon and the resulting warrant for his arrest should not have been admitted only because Mrs. Burks' 2009 letter should not have been admitted. The letter placed Dillon's discovery of the warrant in context. Without the letter, or some other nexus between the initiation of the warrant and Dillon's mother, his discovery of a warrant for his arrest did little, if anything, to establish premeditation and deliberation or a motive for killing his mother. Nevertheless, we do not believe that the admission of testimony about the misdemeanor case and the warrant constituted plain error.

overruled.

{¶ 40} In his third assignment of error, Dillon contends the trial court erred in overruling his motion for a mistrial. His argument concerns the testimony of prosecution witness Sandra Wolfe, a friend of Mrs. Burks.

{¶ 41} Wolfe testified at trial primarily about her friendship with Mrs. Burks and about her observations of Mrs. Burks interacting with Dillon. Early in Wolfe's testimony, the following exchange occurred with the prosecutor:

Q. Now, through your friendship with Vicky, did you observe her struggle with this defendant?

A. All the time.

Q. Again, were those struggles related to when he was little at school?

A. Yes. It first started—when I first noticed it he came to—His dad brought him to K-Mart one day, and we were waiting for Vicky to come out, and I said something to him. He was probably about 4 years old, and he spit in my face.

Q. Wait. I don't want to talk about specific instances.

THE COURT: Approach the bench, please.

(Trial Tr. at 648).

{¶ 42} At a bench conference, the trial court characterized Wolfe's testimony regarding the spitting incident as "the most ridiculous thing I have ever heard in a criminal trial." (*Id.*). Defense counsel moved for a mistrial or, alternatively, to strike the testimony. (*Id.* at 648-650, 653). The trial court overruled the motion for a mistrial, reasoning: "The

statement that was made by the witness revolved around some incident that allegedly occurred when the defendant was four years old. He's now 26, I believe. Given his age at the time of this other act, I think it's reasonable to believe that the jury can disregard it, so I am going to overrule the motion for a mistrial." (*Id.* at 654).

**{¶ 43}** The trial court also immediately instructed the jury as follows:

Ladies and gentlemen, thank you for your patience with us. The witness that is currently on the witness stand made a statement that was not only irrelevant, but we don't know if it was true.

Whether it's true or not, something that the defendant may or may not have done when he was four-years-old is just entirely irrelevant. So I am asking you or ordering you to disregard that; to not consider it for any purpose, and just to do your best to put it out of your mind as we proceed through this case. All right.

(*Id.* at 658).

**{¶ 44}** "The decision whether to grant a mistrial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Williams*, 2d Dist. Montgomery No. 22126, 2008-Ohio-2069, ¶ 30. We see no abuse of discretion in the trial court's denial of a mistrial here. "A mistrial should only be declared when a fair trial is no longer possible." *State v. Nelson*, 2d Dist. Montgomery No. 25026, 2012-Ohio-5797, ¶ 25. The trial court reasonably could have concluded that the comment about Dillon spitting was so plainly irrelevant and so removed in time that it did not deprive him of a fair trial. The trial court acted within its discretion in finding that a cautionary instruction was the proper remedy. The third assignment of error is overruled.

{¶ 45} In his fourth assignment of error, Dillon alleges that he received ineffective assistance of counsel at trial. He advances two arguments in support. First, he contends his attorney provided ineffective assistance by failing to pursue a defense that he was not guilty by reason of insanity (NGRI). Second, he alleges ineffective assistance based on his attorney's failure to object to cyber-crimes investigator Hoyt's testimony about him using white-supremacist screen names and viewing pornography on the internet.

{¶ 46} To prevail on a claim for ineffective assistance, a defendant must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, the defendant must show that trial counsel's representation fell below an objective standard of reasonableness. *Id.* Prejudice exists and a reversal is warranted only where the defendant shows a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).

{¶ 47} We find no ineffective assistance of counsel here. With regard to counsel's failure to pursue an insanity defense, the record reflects that defense counsel filed an entry withdrawing an NGRI plea on February 7, 2014. (Doc. #61). Defense counsel did so after obtaining two competency evaluations, both of which resulted in a finding that Dillon was competent to stand trial. (Doc. #40). We recognize that competency to stand trial and legal insanity at the time of an offense are different. *State v. Flint*, 2d Dist. Clark No. 2014-CA-97, 2015-Ohio-3689, ¶ 11. Nevertheless, Dillon cannot demonstrate, on the record before us, that defense counsel provided deficient representation by not presenting an NGRI defense to the jury. This is so because the record does not

reasonably suggest that Dillon would have prevailed on such a defense. "[A] person cannot be found not guilty by reason of insanity unless he proves that, at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts." *Id.*, citing R.C. 2901.01(A)(14).

{¶ 48} The record contains evidence from which defense counsel could have inferred that Dillon did know the wrongfulness of his acts when he killed his mother. He lied to Mr. Burks concerning her whereabouts shortly after the murder, tried to clean up the crime scene, hid her body, fled the jurisdiction, and lied to police. These acts, among others, constitute strong evidence that Dillon knew what he did was wrong. Therefore, we cannot say defense counsel provided deficient representation by failing to pursue an NGRI defense a trial.

{¶ 49} With regard to the testimony about Dillon using white-supremacist screen names and viewing pornography, we determined in our analysis above that this evidence was objectionable and should not have been admitted. Therefore, defense counsel's failure to object to it constituted deficient performance. We see no reasonable probability, however, that but for counsel's failure to object the result of the proceeding would have been different. In light of the substantial evidence of Dillon's guilt—among other things, evidence found at the crime scene that included his freshly washed clothes and other items with blood on them, his consciousness of guilt as evidenced by his immediate flight, and his lies to Mr. Burks and to the police in Wisconsin—we do not believe defense counsel's failure to object to screen names and evidence of pornography prejudiced Dillon. The fourth assignment of error is overruled.

{¶ 50} In his fifth and sixth assignments of error, Dillon asserts that the record

contains legally insufficient evidence to sustain his aggravated-murder conviction and that the conviction is against the manifest weight of the evidence. In support, he argues that the State presented no direct evidence, no confession, and only limited circumstantial evidence that he killed his mother. He also argues that the State improperly relied on prior-bad-acts evidence and the 2009 letter written by his mother to "assassinate his character."

{¶ 51} Upon review, we note that our resolution of the first assignment of error renders Dillon's manifest-weight argument moot. Having found that the aggravated-murder conviction must be reversed due to the improper admission of Mrs. Burks' 2009 letter, we need not address whether that conviction is against the weight of the evidence. Dillon's argument is not moot, however, insofar as he contends the State presented legally insufficient evidence to sustain the aggravated-murder conviction. If that assertion is correct, then he cannot be retried on the aggravated-murder charge. *State v. Harr*, 158 Ohio App.3d 704, 2004-Ohio-5771, 821 N.E.2d 1058, ¶ 142 (2d Dist.) (recognizing that "a defendant may not be retried after a judgment has been determined to be based on insufficient evidence"). Therefore, we must address the legal sufficiency of the evidence to support the aggravated-murder conviction.

{¶ 52} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's

guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 53}** With the foregoing standards in mind, we conclude that Dillon's aggravated-murder conviction is supported by legally sufficient evidence. He was convicted under R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." In our view, the evidence set forth in our analysis of the first assignment of error is more than sufficient to support a finding that Dillon killed his mother with the requisite purpose and prior calculation and design. In reaching this conclusion, we note that we must consider *all* of the evidence admitted at trial, regardless of whether it was admitted erroneously, including the letter written by Dillon's mother. *State v. Johnson*, 2015-Ohio-5491, __ N.E.3d __, ¶ 95 (2d Dist.) ("The Supreme Court of Ohio has rejected the position that a reviewing court should consider only properly admitted evidence to determine whether the State has presented sufficient evidence to support a conviction."); *State v. Stokes*, 2d Dist. Champaign No. 2015-CA-22, 2016-Ohio-612, ¶ 8, fn. 3 ("[W]hen conducting a review of the sufficiency of the evidence, we must consider all the evidence admitted at trial, even improperly admitted evidence.").This is so because "the State 'may rely upon the trial court's evidentiary rulings in deciding how to present its case.' " *Johnson* at ¶ 95, quoting *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 19. Accordingly, the fifth and sixth assignments of error are overruled.[6]

---

[6] We note that Dillon's fifth and sixth assignments of error specifically refer to his

{¶ 54} In his seventh assignment of error, Dillon raises a speedy-trial argument. Although he references Ohio's speedy-trial statute and the United States Constitution, his substantive argument rests entirely on the statute.

{¶ 55} The sole issue raised under Dillon's seventh assignment of error is whether the roughly two months he spent in jail in Wisconsin before being transported to Ohio should have been counted against the State's speedy-trial time under R.C. 2945.71. Dillon concedes that speedy-trial time normally would not begin to run until his arrival in Ohio. In *State v. Wilson*, 2d Dist. Montgomery No. 24577, 2012-Ohio-3098, this court recognized that "R.C. 2945.72(A) tolls the speedy trial time during any period when a defendant is confined in another state, provided the State exercises reasonable diligence to secure his availability." *Id.* at ¶ 11. In *Wilson*, the defendant waived extradition from Michigan and was transported to Ohio 13 days later. While noting that the reasonable-diligence standard does not impose a " 'particularly exacting duty,' " this court found the 13-day delay not unreasonable. *Id.*, quoting *State v. Bates*, 2d Dist. Montgomery No. 18414, 2001 WL 173188, *1 (Feb. 23, 2001). This court also acknowledged that " 'what constitutes the exercise of reasonable diligence * * * might vary substantially from case to case.' " *Id.*, quoting *Bates*.

{¶ 56} In the present case, Dillon remained incarcerated in Wisconsin for a little more than two months before being returned to Ohio. Unlike the defendant in *Wilson*,

---

"aggravated-murder conviction" or his "conviction," whereas his argument on occasion references unspecified "convictions." To the extent that he may be claiming the purposeful-murder and felony-murder verdicts are against the weight of the evidence or are based on legally insufficient evidence, we disagree. The same evidence discussed earlier that supports his aggravated-murder conviction also plainly supports the jury's guilty verdicts for purposeful murder and felony murder.

however, Dillon fought extradition. (Doc. #55). In light of that fact, the trial court found that the State had exercised reasonable diligence in securing his availability. (*Id.*). In his assignment of error, Dillon fails to mention that he fought extradition. He also cites nothing to controvert the trial court's conclusion that a two-month delay was not unreasonable in light of his opposition to being returned to Ohio. Having reviewed the record, we see nothing to suggest that the State failed to exercise reasonable diligence. The seventh assignment of error is overruled.

{¶ 57} In his eighth assignment of error, Dillon contends the trial court erred in overruling his pretrial motion to suppress comments he made during a custodial interrogation that took place without a waiver of his right to remain silent and right to counsel.

{¶ 58} Dillon's argument concerns the opening minutes of a custodial interrogation that occurred in Wisconsin. At the outset of questioning, a detective read Dillon his *Miranda* rights and asked him to sign a waiver form. Dillon responded by acknowledging an understanding of his rights. The detective proceeded to question Dillon, who responded to the questions. Several minutes into the interview, Dillon slid the unsigned waiver form back toward the detective. Roughly 15 minutes into the interview, Dillon invoked his right to remain silent. (*See* August 16, 2013 hearing transcript at 2-11). Although he did not confess during the first fifteen minutes of interrogation, Dillon argues that playing a recording of the interview at trial harmed his case by creating a likelihood of improper inferences being drawn regarding his credibility. He asserts that the opening minutes of the interrogation should have been suppressed because his act of refusing to sign the waiver form and pushing it back toward the detective demonstrated an intent to

invoke his *Miranda* rights.

{¶ 59} Upon review, we find Dillon's argument to be unpersuasive. A defendant's refusal to sign a waiver does not preclude a valid waiver of *Miranda* rights. *State v. Alford*, 2d Dist. Montgomery No. 23332, 2010-Ohio-2493, ¶ 12. No express written or oral waiver is required. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.E.2d 286 (1979). Instead, waiver can be inferred where a defendant proceeds to speak after being advised of his rights and indicating an understanding of them. This is true even if the defendant refuses to sign a waiver form. *See*, *e.g.*, *State v. Davie*, 80 Ohio St.3d 311, 320, 686 N.E.2d 245 (1997); *State v. Scott*, 61 Ohio St.2d 155, 161, 400 N.E.2d 375 (1980).

{¶ 60} In the present case, Dillon was advised of his *Miranda* rights, he indicated an understanding of those rights, and he elected to speak with a detective for nearly 15 minutes before unequivocally invoking his rights. This situation is similar to *State v. Vance*, 2d Dist. Clark No. 96-CA-84, 1997 WL 351281 (June 27, 1997). In *Vance*, the defendant was advised of his *Miranda* rights and expressed an understanding of them. Although he never explicitly waived his rights, by signing a form or otherwise, this court found an implied waiver based on his act of responding to questioning after *Miranda* warnings had been administered. *Id.* at *2-3. We reach the same conclusion here. We note too that "[t]o operate as a bar to further questioning, a suspect's invocation of his right to remain silent, after *Miranda* warnings have been given and *Miranda* rights have been waived, must be unambiguous." *State v. Blythe*, 2d Dist. Montgomery No. 24961, 2013-Ohio-1688, ¶ 25. Dillon's act of pushing an unsigned waiver form back toward the detective during the interview did not constitute an unambiguous invocation of his *Miranda*

rights. The eighth assignment of error is overruled.

{¶ 61} In his ninth assignment of error, Dillon raises a claim of cumulative error. He contends the effect of the errors alleged in his first eight assignments of error, even if individually harmless, cumulatively deprived him of a fair trial.

{¶ 62} It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are aggregated. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). To find cumulative error, we first must find multiple errors committed at trial. *Id.* at 398, 721 N.E.2d 52. We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328 (Sept. 21, 2001).

{¶ 63} In our review of Dillon's other arguments, we have found two instances of error. As set forth above, they concern the trial court (1) admitting into evidence his mother's 2009 letter and evidence about his discovery of a warrant for his arrest and (2) allowing the jury to hear testimony about him accessing pornography on the internet and white-supremacist screen names. In our analysis of Dillon's first assignment of error, we concluded that admission of the letter constituted prejudicial error with respect to his aggravated-murder conviction because it went to the issue of premeditation and deliberation, but harmless error as to the finding of guilt on the other murder charges. In our analysis of Dillon's second assignment of error, we concluded that the admission of evidence about him discovering a warrant, accessing pornography, and using white-supremacist screen names constituted harmless error and did not qualify as plain error. Even considering the aggregate effect of the foregoing errors, we are convinced that they

were harmless with respect to Dillon's other convictions. We find no reasonable probability that the outcome below would have been different but for the combination of these errors. The ninth assignment of error is overruled.

**{¶ 64}** Having sustained Dillon's first assignment of error, we reverse his conviction and sentence for aggravated murder and remand the cause for further proceedings consistent with this opinion. In all other respects, the trial court's judgment is affirmed.

**{¶ 65}** Judgment affirmed in part, reversed in part, and cause remanded.

. . . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

Ryan A. Saunders
Daniel R. Allnutt
Hon. Douglas M. Rastatter