[Cite as *State v. Rose*, 2022-Ohio-3197.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

JOHN R. ROSE,

        Defendant-Appellant.

**CASE NO. 2021-A-0015**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00226

## O P I N I O N

Decided: September 12, 2022
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Wesley A. Johnston*, 6060 Rockside Woods Boulevard, N., Suite 200, Cleveland, OH 44131 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, John Rose, appeals his conviction from the Ashtabula County Court of Common Pleas for one count of Aggravated Murder, in violation of R.C. 2903.01(A).

{¶2} Appellant raises five assignments of error, arguing: (1) that his conviction is not supported by sufficient evidence, (2) that his conviction is against the manifest weight of the evidence, (3) that the trial court erred when it failed to advise appellant's wife of her right to refuse to testify against appellant, (4) that the trial court erred by allowing the State

to play a video and use improper jury questionnaires during voir dire, and (5) that appellant received ineffective assistance of counsel.

{¶3} After review of the record and the applicable caselaw, we find appellant's assignments of error to be without merit. Appellant's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. The trial court erred in violation of Evid.R. 601(B) by not making an affirmative determination on the record that appellant's spouse, Marie Rose, elected to testify against him. However, this error did not affect the outcome of the trial and the result of the trial would have been the same absent her testimony. Next, the trial court did not abuse its discretion in permitting the State to present a demonstrative video during voir dire and the jury questionnaires used were appropriate and modeled after R.C. 2945.25. Further, the destruction of the questionnaires did not prejudice appellant. Finally, appellant's trial counsel did not render ineffective assistance of counsel.

{¶4} Therefore, we affirm the judgment of the Ashtabula County Court of Common Pleas.

## Substantive and Procedural History

{¶5} In June 2020, appellant was indicted by the Ashtabula County Grand Jury. He was charged with: Count One: Aggravated Murder in violation of R.C. 2903.01(A), an unclassified felony; Count Two: Murder in violation of R.C. 2903.02(A), an unclassified felony; Count Three: Murder in violation of R.C. 2903.02(B), an unclassified felony; and Count Four: Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the second degree.

2

Case No. 2021-A-0015

{¶6} Appellant pled not guilty and a jury trial was held. At trial, the State presented ten witnesses, including that of appellant's wife, Marie Rose. Appellant testified on his own behalf.

{¶7} When the State called Marie Rose, the prosecutor stated on the record, "I would bring to your attention that – and we discussed this briefly yesterday – I have spoken to Marie Rose. There were people present when some statements were made to her by the Defendant, and I will lay a foundation to that before I ask what was said."

{¶8} Marie Rose testified that appellant lived with her in the same residence. She said that on the date of Paul Ruffo's death, she lived at her house with appellant, her children, her ex-boyfriend Edward Becker, Jerry McRoberts, Gabby Reo, and Rachael Clevenger.

{¶9} The prosecutor asked if appellant had ever talked to Marie Rose about Ruffo. She answered that he did. The prosecutor asked if anybody else was present during those conversations. She said that Becker was present for one of those conversations in late May or early June of 2020. The prosecutor asked what was said and Marie Rose said that appellant did not like Ruffo because Clevenger "was always going to his house." According to Marie Rose, appellant said that if Ruffo keeps giving Clevenger heroin, "that he's going to harm him in a way, hmm basically, just not if Rachael's over there. And he, ah, he kept saying that he was going to hurt him if he kept giving her drugs, giving her H, heroin." Marie Rose testified that appellant said he was going to kill Ruffo. The prosecutor asked again, "were there other people around when [appellant] said that?" Marie Rose said, "my ex-boyfriend, Edward [Becker]."

3

{¶10} On June 2, Marie Rose said that appellant left the house and later returned around 2:00 am on June 3. She said that when appellant returned home, Becker was in the room with her as well. She said that appellant came into the bedroom and said "I think I screwed up this time. Um, I think I -- I might have killed him. I'm pretty sure that what he said." Trial counsel objected to this line of questioning and the trial court overruled the objection. In closing arguments, the State characterized Marie Rose's testimony as "very powerful."

{¶11} The State introduced evidence of the 911 call that Rachael Clevenger made calling for an ambulance. In the call, Clevenger is distraught and unable to state the nature of the emergency.

{¶12} The State called Deputy James Lewis from the Ashtabula County Sheriff's Office. The State also admitted body camera footage from Lewis while he was at the scene. Lewis testified that on June 2, 2020, he arrived at the crime scene and saw Clevenger screaming for help. Lewis saw blood at the scene outside and found Ruffo laying in the bathtub with blood on his left side. He said Clevenger was "panicky and shaken up" and stated that Ruffo had been stabbed.

{¶13} Clevenger told Lewis that appellant stabbed Ruffo and that he was wearing camouflage shorts with construction boots and a green t-shirt. She said that she did not see appellant stab Ruffo, but that Ruffo and appellant stepped outside to talk and that Ruffo came back inside after being stabbed.

{¶14} Lewis took a series of photographs of the scene depicting the location of blood in the front yard, on the sidewalk and stairway to the porch, on the front porch, and

4

the doorway. A drink lid and a green t-shirt were also found outside with blood on them. Finally, Lewis testified that Clevenger had died of a drug overdose prior to trial.

{¶15} The State next called Thomas Ricker, who responded as a paramedic to the scene. He said that when he arrived, he evaluated Ruffo, removed him from the home and determined that he had no heartbeat, was no longer bleeding from his wound, and had fixed pupils. After consulting with Dr. Kehrer from the Geneva Emergency Room, it was determined that Ruffo was deceased.

{¶16} The next witness was Dr. Evan Howe, a deputy coroner from the Ashtabula County Coroner's Office. Howe determined that Ruffo's cause of death was a stab wound to the chest and the manner of death was homicide.

{¶17} The State called Dr. Joseph Felo, a forensic pathologist from the Cuyahoga County Medical Examiner's Office. Felo said that one of his subordinates, Dr. Elizabeth Mooney conducted Ruffo's autopsy. Felo testified as to Mooney's findings in her autopsy report. He said that Ruffo had four sharp injuries caused by a knife on his body. One stab wound into his chest, which was fatal, and three other sharp injuries on his left upper arm. He also had fresh scattered blunt trauma on his body including abrasions and contusions.

{¶18} Next, the State called Deputy Leonard Emch of the Ashtabula County Sheriff's Office. Emch stated that he went to appellant's residence after the stabbing. Emch encountered Marie Rose. Emch found appellant in a locked bedroom and arrested him. Appellant admitted to being at Ruffo's residence and said that Ruffo "clotheslined" him off the porch after an altercation. He said that he went home after this and denied having any weapons at the time. When Emch arrested appellant, he was wearing a white t-shirt, camouflage pants, and a brown belt. He admitted that he left a green shirt and hat

5

at Ruffo's residence. Deputies recovered a number of knives and sharpening stones in appellant's room.

{¶19} Lieutenant Bryan Rose testified that he knew Ruffo through prior contact with him and that Ruffo did not have a reputation for violence. Lieutenant Rose was present when deputies arrested appellant. He said that appellant admitted that he always carried a pocketknife but that he did not know where it was at the time of his arrest.

{¶20} Detective Sean Ward testified he investigated Ruffo's murder. He said that based on the condition of the scene, that he believed Ruffo was stabbed in the yard and that he walked up the porch steps to the house while projecting blood on the siding. He said that the majority of the blood was on the left side of the steps, indicating that Ruffo walked up the steps while bleeding.

{¶21} Ward interviewed appellant on June 3. Appellant told Ward that Ruffo was the aggressor in the situation. Appellant did not admit to having a knife and denied causing harm to Ruffo. Appellant told Ward that Ruffo clotheslined him over the porch. Ward said that he observed no disturbances on the ground that would indicate Ruffo clotheslined appellant over the railing of the porch. In the interview, appellant denied knowing how Ruffo was stabbed but suggested that Ruffo injured himself falling over the railing of the porch or that Clevenger stabbed him.

{¶22} On June 4, Ward executed a search warrant to obtain appellant's DNA. During that process, appellant asked to speak with Ward again. Ward conducted a second interview with appellant.

{¶23} In the second interview, appellant said that he was concerned about drug activity at Ruffo's house and was concerned about Clevenger's involvement with Ruffo.

6

Appellant said that he went to the house and talked to Clevenger on the front porch. Clevenger went inside and Ruffo came out. Appellant admitted that he did have a knife on him. He said that Ruffo rushed him and the two went over the porch railing. He told Ward that he could show him where he discarded the knife. He did not say whether Ruffo was armed. He told Ward that he "wasn't trying to defend anybody."

{¶24} Ward then transported appellant to the location where he discarded the knife. On the way to recover the knife, appellant again changed his story and said that he had discarded two knives. One, a green handled knife that belonged to him, and the second was a knife that belonged to Ruffo, which appellant had taken before leaving the scene. Appellant indicated the location where he had thrown the knives and deputies were able to recover appellant's green handled pocketknife. The following day, a concerned citizen reported that they had found a knife in the area where appellant's green handled knife was recovered. Ward stated that the two knives were similar style knives.

{¶25} Ward also obtained appellant's Facebook records which contained messages from appellant to Clevenger. In a message sent June 1, the day before Ruffo was stabbed, appellant told Clevenger that "Ahhh, Mr. racoon eyes something coming and it looks like it's going to happen at his work, how long did u think it was gonna be4 I found out? I also have his address! May as well tell him goodbye." In another message he said "I love u rachael don't make me see that something happens to Mr. Racoon eyes u know it won't take much! U need to stop your nonsense." On June 2, the day of Ruffo's death, appellant told Clevenger that "Raccoon eyes is a dead motherf*****!" Appellant also told Clevenger that "Im getting pissed who you f***** with cuz if I catch you with some1 else u know what's going to happen." In another message mere hours before

7

Ruffo was stabbed, appellant sent a message that said, "I don't care who the f***'s there, Ill waste everybody."

{¶26} Ward also reviewed Ruffo's personal cell phone and found messages between Ruffo and appellant. In one message four days prior to the stabbing, appellant sent Ruffo a message that said "Ill be over in a few then ill be back every hour on the hour hope I'm not met with resistance. Like I said kill or die for her." In another message sent three days before Ruffo died, appellant said "We'll be back over with a few more cats to party on your porch you don't mind do you…… Didn't think so …. Maybe you shouldn't lie to people and feed heroin to rachael just because it's the only possibility of having your way with her. When we get back we're walking right in and if Im satisfied she's not there Ill apologize and walk away but it she is there Im gonna be pissed but I already know." On June 2, the day of Ruffo's death, appellant sent Ruffo a message that said "U sorry son of a b***** i can't even tell you how f****** up sh*** about to be. If I were u I wouldn't even want to be in that f****** house. * * * Watch out mother***** your f****** through pimp daddy." Appellant sent other similar threatening messages directly to Ruffo in the days leading up to the stabbing. Ruffo did not reply to these messages.

{¶27} The State next called Julie Altizer, a forensic scientist at the forensic and biology section of the Bureau of Criminal Investigation (BCI). She testified that she analyzed the DNA evidence in this case, including samples from a green tshirt, camouflage pants, and a green knife. Altizer said that she found blood belonging to Ruffo on each of these items.

{¶28} The State rested and appellant testified on his own behalf. He admitted that he sent the Facebook and text messages about Ruffo but said that he was intoxicated

8

when he sent the messages and often said things while intoxicated that he did not mean. He said that his true intention was to threaten to call the police and report that Ruffo was operating a drug house.

{¶29} Appellant testified that he and Clevenger had a feud two days prior to Ruffo's death and that Clevenger left to stay at Ruffo's house. Appellant said that Clevenger would often go to Ruffo's house to get heroin. Appellant said that Clevenger's heroin use bothered him and that he did not like when she obtained heroin from Ruffo. He said that on June 2, Clevenger messaged appellant and he went to Ruffo's house to pick her up.

{¶30} Appellant said that he talked to Clevenger on the porch and that she went inside to gather her belongings. Appellant said that Ruffo came out to the porch with a knife in his hand. The two exchanged words and Ruffo ran at appellant and the two went over the porch railing and started wrestling. Appellant said he had no idea that he stabbed Ruffo during the encounter. He said that "I shoved and kicked him off -- my knife was open, but I shoved and kicked him off, and I grabbed his knife because I didn't want another chance to get skinned. You know? I was scared." He said he fled the scene because he did not want to be labeled as a snitch. Initially, appellant did not believe that he had seriously harmed Ruffo. He said that all he tried to do was shove Ruffo off him, which was "the only way he could have got stuck." He said that he at first refused to believe that he could have stabbed Ruffo in self-defense and did not want to believe he was responsible. He said that he came to believe that he "must have" stabbed Ruffo during their scuffle on the ground because "there's no other possibility." Appellant

9

acknowledged that he lied to Detective Ward in his first interview with him by saying that he did not have a knife.

{¶31} The trial court instructed the jury on self-defense and the jury found appellant guilty on all counts. The trial court found that Counts Two, Three, and Four merged with Count One for purposes of sentencing. The court sentenced appellant to life in prison without the possibility of parole.

{¶32} Appellant timely filed this appeal asserting five assignments of error. After filing his appeal, he sought to supplement the record with a video that the prosecutor played for the jury during voir dire and jury questionnaires used during voir dire. We remanded to the trial court to supplement the record. After a hearing, the trial court issued a March 7, 2022 judgment entry supplementing the record with the prosecutor's jury video and with the blank jury questionnaires used during void dire. However, the court indicated that the practice in the Ashtabula County Court of Common Pleas is to destroy the completed questionnaires after the jury has been selected.

{¶33} After this, appellant again sought a limited remand to clarify a discrepancy between the trial transcript and the trial court's March 7, 2022 judgment entry. On remand, the trial court said that appellant had not objected to the use of the jury video. The transcript does indicate that appellant objected to its use. We overruled the request for remand and stated that "[b]ecause there is an inconsistency between what is stated in the entry on remand and what is written in a transcript of proceedings, the transcript controls."

## Assignments of Error and Analysis

{¶34} Appellant's first and second assignments of error state:

10

Case No. 2021-A-0015

{¶35} "[1.] ROSE'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE AS A MATTER OF LAW."

{¶36} "[2.] ROSE'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶37} Appellant asserts that his conviction was not supported by sufficient evidence and that it was against the manifest weight of the evidence. App.R. 16(A)(7) requires an appellant's brief to provide "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." "It is not an appellate court's duty to guess the arguments of an appellant." *Dennis v. Nickajack Farms, Ltd.*, 11th Dist. Geauga No. 2014–G–3188, 2014-Ohio-5468, ¶ 6.

{¶38} The first two assignments of error in appellant's brief merely provide citations to authority without offering any argument or any citation to the record. This constitutes a failure to comply with App.R. 16 for which this court could summarily dismiss these assignments of error. Nevertheless, we have conducted a review of the entire record and address these assignments on a merit basis. *See City of Aurora v. Hale*, 11th Dist. Portage No. 88-P-2015, 1989 WL 85675, *1, (July 28, 1989).

**Sufficiency of the Evidence:**

{¶39} "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St. 3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary (6 Ed.1990) 1433; See also

11

Case No. 2021-A-0015

Crim.R. 29(A). The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light most favorable to the prosecution, whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶40} When evaluating the sufficiency of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offense and a review of the State's evidence. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

**Manifest Weight of the Evidence:**

{¶41} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins,* 78 Ohio St. 3d at 389. Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them." (Emphasis sic.) *Id.* at 386, quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶42} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a

12

'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*

{¶43} The reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶44} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any of the outcome of the case and the connection with the prosecution or the defendant. *Id.,* quoting *Antil* at 67. This court, engaging in the limited weighing of the evidence introduced at trial, must defer to the weight and factual findings made by the jury. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶ 52, citing *Thompkins* at 390 and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph two of the syllabus.

{¶45} A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

13

Case No. 2021-A-0015

{¶46} In this case, appellant was convicted of Aggravated Murder in violation of R.C. 2903.01(A), which provides that: "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." The trial court gave the jury a self-defense instruction at appellant's request. The General Assembly amended the provisions in R.C. 2901.05 that define self-defense effective on March 28, 2019.

{¶47} Since that amendment, R.C. 2901.05 now places the burden of persuasion upon the State to disprove at least one of the elements of self-defense beyond a reasonable doubt. *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 55 (11th Dist.), *appeal not allowed*, 160 Ohio St.3d 1460, 2020-Ohio-5332, 157 N.E.3d 794, *reconsideration denied*, 160 Ohio St.3d 1512, 2020-Ohio-6835, 159 N.E.3d 1172; R.C. 2901.05(A).

{¶48} At the time of appellant's offense, the elements of a valid claim of self-defense were: "(1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus; *State v. Mogul*, 11th Dist. Trumbull Nos. 97-T-0018 & 97-T-0067, 1998 WL 258164, *3 (May 15, 1998)." *Id.* at ¶ 41. "The degree of force permitted depends upon what is reasonably necessary to protect that individual from the imminent use of unlawful force." *Id.* at ¶ 42, citing *Mogul*, 1998 WL 258164 at *3.

14

Case No. 2021-A-0015

**{¶49}** We must therefore determine whether the jury lost its way and created a manifest miscarriage of justice in finding that the State disproved at least one of the elements of self-defense beyond a reasonable doubt. At trial, the State presented evidence to disprove that appellant was not at fault for creating the situation giving rise to the affray and that he had a bona fide belief that he was in imminent danger of death or great bodily harm.

**{¶50}** The State presented testimony from multiple Ashtabula County Sheriff's Office deputies. Deputy Lewis responded to the crime scene and observed Rachael Clevenger screaming for help acting "panicky and shaken up." The deputies observed blood on the sidewalk and the porch and various parts of the front yard. Deputies entered the house and found Ruffo in the tub with blood on the left side of his body.

**{¶51}** Clevenger's statements to Lewis indicated that appellant had stabbed Ruffo. She described appellant's clothing and gave his address. She explained what appellant had been doing at the residence before the stabbing.

**{¶52}** When officers arrived at appellant's address, they found him in a locked bedroom wearing the same clothing described by Clevenger. Appellant lied to officers about having a knife at the scene. Appellant initially told the deputies that he and Ruffo got into an altercation and that Ruffo clotheslined him off the porch and that he left after that. He denied having any weapons and said that he did not know where the folding knife that he always carries was.

**{¶53}** In his first interview with Detective Ward, appellant denied harming Ruffo and denied having a knife at the time of the altercation. He denied knowing how Ruffo was stabbed. In his second interview with Ward, appellant admitted that he had a knife

15

and revealed where he had discarded the weapon. On the way to recover appellant's knife, he again changed his story and said that Ruffo also had a knife and that he had discarded that weapon in the same area. This was the first time that appellant said that Ruffo used a knife to threaten him.

{¶54} "The law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself." *State v. Robinson*, 6th Dist. No. L-06-1182, 2008-Ohio-3498, ¶ 202; *see also, e.g., State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 54, ("The trier of fact was at liberty to infer consciousness of guilt from [defendant's] lie.").

{¶55} Appellant sent Facebook messages to Clevenger stating that he intended to harm Ruffo. Appellant also sent text messages to Ruffo threatening harm. Appellant sent those messages on the day of Ruffo's death and testified that he had also been drinking that day and was intoxicated when he sent the messages. Ruffo's personal items were at the scene and Ruffo's blood was on the pants appellant was wearing when he was arrested.

{¶56} Dr. Howe, the deputy coroner, testified that the cause of Ruffo's death was a stab wound to the chest and determined that the cause of death was homicide. Altizer, the BCI investigator, said that Ruffo's blood was found on pants appellant was wearing, on the clothes appellant left at the scene, and that appellant's green handled knife had Ruffo's blood on the blade.

{¶57} In appellant's testimony, he denied having knowledge that he even stabbed Ruffo and only assumed that he "must have" been stabbed during their altercation on the ground. However, appellant fled the scene after his altercation with Ruffo and discarded

16

the knives. *See State v. Dillon*, 2016-Ohio-1561, 63 N.E.3d 712, ¶ 49 (2nd Dist.) (Substantial evidence of appellant's guilt included "consciousness of guilt as evidenced by his immediate flight," and his lies to the police).

{¶58} The State presented sufficient evidence that appellant committed the offense of Aggravated Murder. This evidence, if believed, can sustain the verdict against appellant. *See Thompkins*, at 387. Further, based on this evidence, this is not 'the exceptional case in which the evidence weighs heavily against the conviction." *Martin*, 20 Ohio App.3d at 175.

{¶59} Accordingly, appellant's first and second assignments of error are without merit.

{¶60} Appellant's third assignment of error states:

{¶61} "[3.] THE TRIAL COURT COMMITTED REVERSED [sic] ERROR WHEN IT ALLOW [sic] MARIE ROSE TO TESTIFY AGAINST EVID.R. 601."

**Marie Rose's Testimony:**

{¶62} In his third assignment of error, appellant argues that the trial court committed plain error by failing to make an affirmative determination on the record that appellant's spouse, Marie Rose, elected to testify. Marie Rose testified that appellant came home and told her "I think I screwed up this time. Um, I think I – I might have killed him." This testimony directly contradicted appellant's testimony on his own behalf where he stated he did not initially know that he had stabbed Ruffo and where he only later realized that Ruffo "must have" been stabbed during their scuffle.

{¶63} Evid.R. 601(B) addresses the competency of a spouse to testify against their partner regarding criminal activity. It provides that:

17

Every person is competent to be a witness except: * * * (B) A spouse testifying against the other spouse charged with a crime except when either of the following applies:
(1) A crime against the testifying spouse or a child of either spouse is charged;
(2) The testifying spouse elects to testify.

{¶64} While Evid.R. 601(B) addresses the competency of a testifying spouse, R.C. 2945.42 focuses on spousal privilege and states that a spouse "shall not testify concerning communications made on to the other, * * *, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness." R.C. 2945.42 bars the accused from asserting spousal privilege even if the third person is unable to testify. *State v. Adamson*, 72 Ohio St.3d 431, 433, 650 N.E.2d 875 (1995), citing See *State v. Mowery*, 1 Ohio St.3d 192, 438 N.E.2d 897 (1982).

{¶65} "Spousal privilege and spousal competency are distinct legal concepts which interrelate and provide two different levels of protection for communications between spouses." *Id.* However, in cases where privilege does not apply because another person witnessed a private act or a spousal communication, "a spouse is still not *competent* to testify about those acts or communications unless she specifically elects to testify." *Id.*

{¶66} In *Adamson*, the trial court correctly recognized that spousal privilege did not apply where an act was performed in the presence of a third person. *Id.* at 434. However, the trial court ignored the requirements of Evid.R. 601 which "requires that the testifying spouse to *elect* to testify against her spouse." *Id.* "An election is '"[t]he choice of an alternative[;] [t]he internal, free, and spontaneous separation of one thing from another,

18

Case No. 2021-A-0015

without compulsion, consisting in intention and will.'" *Id.*, quoting *Black's Law Dictionary* (5 Ed.1990) 517. Unless a spouse with knowledge of a right to refuse deliberately chooses to testify, that spouse remains incompetent to testify under Evid.R. 601(B). *Id.*

{¶67} The trial judge "must take an active role in determining competency, and make an affirmative determination on the record that the spouse has elected to testify." *Id.* Merely responding to a subpoena and appearing on the witness stand does not indicate a spouse has elected to testify. *Id.*

{¶68} In *Adamson*, the trial court failed to determine that the spouse had elected to testify. The court said that even where trial counsel fails to object, this is clearly error. *Id.* Using a plain error standard of review, the court said that the outcome of the trial would have been different without the spouse's testimony because the "testimony certainly was the key factor in Adamson's conviction for aggravated murder." *Id.* at 435.

{¶69} The standard of review for plain error is the same deferential standard applied for "reviewing ineffective assistance of counsel claims." *State v. Payne*, 114 Ohio St.3d 502, 2007–Ohio–4642, 873 N.E.2d 306, ¶ 17. "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Appellant bears the burden of demonstrating plain error by proving that the outcome would have been different absent the plain error. *Payne*, at ¶ 17.

19

{¶70} Further, even when the error is obvious, "it must have affected substantial rights," meaning "'that the trial court's error must have affected the outcome of the trial.'" *Id.,* quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Indeed, "even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it * * *." *Id.* at ¶ 23. Courts are cautioned "to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes,* at 27, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶71} Unlike in *Adamson*, in *State v. Davis*, 195 Ohio App.3d 123, 2011-Ohio-2387, 958 N.E.2d 1260 (8th Dist.), the court found that the "outcome of the trial would have been the same regardless of the error in admitting defendant's wife's testimony. Reversal is not necessary to prevent a manifest miscarriage of justice, because defendant's multiple rape and gross sexual imposition convictions are supported by the testimony of the two victims." *Id.* at ¶ 10. On the strength of the other "specific and consistent testimony" in the case, the court could not say that the result would have been different had the spouse not testified and was therefore not prejudicial to the defendant. *Id.* at ¶ 16.

{¶72} In this case, while the State overcame any possible spousal privilege issues by laying a foundation that third persons were present for appellant's statements, the trial court erred when it failed to make an affirmative determination on the record that Marie Rose had elected to testify.

{¶73} However, we cannot say that the outcome of the trial would have been different without Marie Rose's testimony. Appellant himself admitted that he sent

20

threatening messages to Ruffo including messages hours before Ruffo's death. He also admitted having been drinking and that he was intoxicated at the time he sent those messages. Appellant testified as to his relationship with Clevenger and stated that he did not like that Clevenger frequently obtained heroin from Ruffo and stayed with him. Appellant fled the scene and disposed of the knife that killed Ruffo, which appellant later admitted was his knife. He admitted that he lied to the police about having a knife during his altercation with Ruffo. Ruffo's blood was on appellant's clothing. Ruffo's autopsy indicated that he had four sharp injuries caused by a knife on his body, including the fatal stab wound.

{¶74} Without consideration for Marie Rose's testimony, appellant's flight, discarding the weapons, and dishonest statements severely undermine his claim of self-defense. *See Dillon*, 2016-Ohio-1561, at ¶ 49 (Substantial evidence of appellant's guilt included "consciousness of guilt as evidenced by his immediate flight," and his lies to the police) and *State v. Robinson*, 2008-Ohio-3498, at ¶ 202 ("The law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself.").

{¶75} Even without Marie Rose's testimony, as our discussion in reference to the sufficiency and manifest weight of the evidence indicated above, the State still presented strong evidence from multiple witnesses indicating that appellant acted with purpose, and with prior calculation and design to cause the death of Ruffo. We cannot say that the result of the trial would have been different absent Marie Rose's testimony.

{¶76} Accordingly, appellant's third assignment of error is without merit.

{¶77} Appellant's fourth assignment of error states:

21

Case No. 2021-A-0015

{¶78} "[4.] THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE PROSECUTOR TO PLAY VIDEO AT VOIR DIRE AND BY DESTRYOING THE IMPROPER JURY QUESTIONNAIRES FOR TRIAL FOR JURORS."

{¶79} In his fourth assignment of error, appellant asserts that the trial court erred by allowing the State to play a video during voir dire and for using improper jury questionnaires. Appellant does not cite any legal authority in support of his position. Further, appellant does not cite to any portion of the record. This constitutes a failure to comply with App.R. 16 for which this court could summarily dismiss his assignment of error. Nevertheless, we have conducted a review of the entire record and address this assignment on a merit basis. *See Hale*, 1989 WL 85675, *1.

{¶80} R.C. 2945.27 provides that the trial court "shall examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by the defendant or his counsel." "'The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge.'" *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 72, quoting *State v. Lorraine,* 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993). "[W]here there is a failure to object, the plain error standard is applied." *State v. Zachery*, 11th Dist. Trumbull No. 2019-T-0082, 2021-Ohio-2176, ¶ 42, *appeal not allowed*, 165 Ohio St.3d 1425, 2021-Ohio-3730, 175 N.E.3d 578. The trial court is given "great latitude in deciding what questions should be asked on voir dire." *Id*, quoting *Mu'Min v. Virginia,* 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

22

Case No. 2021-A-0015

{¶81} "'The term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record.' *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-208 [2009 WL 1177050], ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678 [148 N.E. 362] (1925)." *State v. Raia*, 11th Dist. Portage No. 2013-P-0020, 2014-Ohio-2707, ¶ 9. Stated differently, an abuse of discretion is "the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" *Id.*, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004). "When an appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.'" *Id.*, quoting *Beechler* at ¶ 67.

{¶82} Appellant argues that the trial court erred when it overruled his objection and allowed the State to play a video during voir dire and that the court erred by using improper juror questionnaires. Appellant sought remand to supplement the record and this matter was remanded for an evidentiary hearing.

{¶83} After the hearing, the trial court issued a judgment entry on March 7, 2022, in which the court said that the juror questionnaire used in this case was developed by Judge Thomas E. Harris with the input of the Ashtabula County Criminal Defense Attorneys and the Conneaut City Law Director. Before trial, attorneys receive a copy of the filled-out questionnaire for use during voir dire. After jury selection, the Ashtabula

23

Common Pleas Court practice is to destroy the filled-out forms. The form has been in use for 32 years.

**{¶84}** The judgment entry also said that a COVID-19 screening questionnaire was used to identify prospective jurors who might be at risk of infecting other people. This form was introduced in June 2020.

**{¶85}** The entry also addressed a DVD that the State played during voir dire. The DVD was the personal property of the assistant prosecutor. The court included a copy of the disc as part of the record on remand. The court further said that appellant's trial counsel did not object to "displaying the DVD to the prospective jurors." However, appellant filed a second request for a remand, noting that the transcript contradicts the March 7, 2022 judgment entry and does contain objections. This court issued a judgment entry on May 10, 2022, denying the request for remand and stating that "because there is an inconsistency between what is stated in the entry on remand and what is written in a transcript of proceedings, the transcript controls."

**Prosecutor's Voir Dire Video:**

**{¶86}** As noted above, appellant did not cite to specific portions of the transcript in support of this assignment of error. However, after reviewing the transcript, appellant's trial counsel does in fact object to the prosecutor showing the video during voir dire. The trial court overruled that objection on the basis that the video was not evidence and was used as part of voir dire.

**{¶87}** The video is one minute 20 seconds and shows a small child with red sprinkles on his face. The mother asks the child if he ate anything, and the child denies having eaten any snacks. The mother then shows a container of red sprinkles spilled on

24

the counter and the child denies having eaten the sprinkles. Finally, the mother tells the child that he has sprinkles on his face, he feels his face and denies that there are any sprinkles on his face. After playing this video, the prosecutor asked the prospective jurors a series of questions relating to circumstantial evidence.

{¶88} The video was a demonstrative example of the example given in the Ohio Jury Instructions. The OJI instruction provides:

> The classic example of direct and circumstantial evidence is if a jury must decide whether a hypothetical boy named Johnny ate a piece of cherry pie. If a person walked into the kitchen and saw Johnny eating the pie, that would be direct evidence that he ate the pie. If a person walked in and saw Johnny with an empty pie plate in his hand, cherry pie around his mouth, and a smile on his face, that would be circumstantial evidence that he ate the pie. There are four varieties or manners in which evidence will be introduced at trial: testimonial evidence, real or demonstrative evidence, stipulation, and facts as a matter of law.

Ohio Jury Instructions, Preliminary instructions: sample instruction; Section CR 205.01 (Rev. 6/7/14).

{¶89} Just as in the video the prosecutor played, the OJI example involves circumstantial evidence of misconduct. The purpose of both the prosecutor's demonstrative video and the OJI example is to highlight to the jury that it may rely on circumstantial evidence to determine guilt. After appellant's trial counsel objected to the use of the video, the trial court overruled the objection and explained to the jury that the video "is not evidence. This is just what he's using as part of his voir dire."

{¶90} The trial court did not fail to exercise sound, reasonable, and legal decision-making in permitting the State to use a demonstrative video during voir dire in this manner. *See Raia*, 2014-Ohio-2707, ¶ 9.

25

Case No. 2021-A-0015

**Juror Questionnaires:**

{¶91} Next, appellant argues that the jury questionnaire the trial court used was improper because the questionnaires did not explicitly name the victim and his family. During voir dire, one of the jurors that would be impaneled stated that he knew of the victim and his family. Further, he argues that it was error for the trial court to destroy the questionnaires after use. Appellant did not make an objection at trial. Therefore, we analyze this portion of his assignment of error under a plain error standard.

{¶92} As stated above, to find plain error, we must find that "but for the error, the outcome of the trial would clearly have been otherwise." *Payne*, 114 Ohio St.3d 502, at ¶ 17.

{¶93} Appellant's specific objections to the destruction of the questionnaires relates to one particular juror who stated that he "knew of" the victim and his family. The record demonstrates that one juror indicated that he knew of the victim, Paul Ruffo, through a work-related connection. The juror said that he did not "hang out" with him but "knew of him." The court asked, "does the fact that you may have known him make it difficult for you to be a fair and impartial juror in this case?" The juror said that it would not impact his ability to sit on the jury. No further discussion was had on the subject and trial counsel did not object or seek to strike the juror for cause or with a peremptory strike. The juror's answers to the trial court's direct questioning indicated that this slight relationship would not impact his ability to be an impartial juror.

{¶94} We cannot find that the trial court abused its discretion in using the jury questionnaires. Most of the questions on the form are derived from R.C. 2945.25 and the questionnaire had been in use for decades. The form included a section asking jurors if

26

they knew the defendant, the attorneys, or any prospective witnesses. The form did not include the name of the victim or the victim's family. Appellant's assertion that the form ought to have had more information than it did is not demonstrative that the trial court abused its discretion in using the form.

{¶95} Further, we need not decide whether it was error for the court to destroy the questionnaires because appellant's concerns about this juror were not included on the questionnaire to begin with and those concerns were specifically addressed on the record. Appellant failed to object and did not seek to strike the juror.

{¶96} Analyzing the juror's answers and suitability to sit on the panel under a plain error standard, we cannot find that but for the destruction of the juror questionnaires, "the outcome of the trial would clearly have been otherwise." *See Issa*, 93 Ohio St.3d at 56. The use of these questionnaires falls within the trial court's province to determine the manner in which voir dire is conducted. *See Thompson*, 141 Ohio St.3d 254 at ¶ 72.

{¶97} Accordingly, appellant's fourth assignment of error is without merit.

{¶98} Appellant's third assignment of error states:

{¶99} "[5.] DID TRIAL COUNSEL RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL."

{¶100} Again, appellant has failed to satisfy the requirements of App.R. 16. In this assignment of error, he fails to cite any authority and fails to cite to any portion of the record. He merely makes the conclusory statements that "[c]ounsel did not get his own expert to challenge DNA, counsel did not meet with client to review the case. Client did not subpoena any witnesses for defendant including his son or anybody."

27

**{¶101}** This constitutes a failure to comply with App.R. 16 for which this court could summarily dismiss his assignment of error. Nevertheless, we have conducted a review of the entire record and address this assignment on a merit basis. *See Hale*, 1989 WL 85675, *1.

**Ineffective Assistance of Counsel:**

**{¶102}** In reviewing an ineffective assistance of counsel claim, the standard we apply is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Story*, 11th Dist. Ashtabula No. 2006-A-0085, 2007-Ohio-4959, ¶ 49, quoting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An appellant must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different. *Strickland* at 669. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. A failure to "satisfy one prong of the Strickland test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 2000-Ohio-448, 721 N.E.2d 52, citing *Strickland* at 697.

**{¶103}** An appellant "must be able to demonstrate that the attorney made errors so serious that he or she was not functioning as 'counsel' as guaranteed by the Sixth Amendment, and that he was prejudiced by the deficient performance." *Story, supra*, 2007-Ohio-4959, ¶ 49, quoting *State v. Batich*, 11th Dist. Ashtabula No. 2006-A-0031, 2007-Ohio-2305, ¶ 42. Ohio courts presume that every properly licensed attorney is competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio

28

St.3d 98, 100, 477 N.E.2d 1128 (1985). "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). "Failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Henderson*, 8th Dist. Cuyahoga No. 88185, 2007–Ohio–2372, at ¶ 42.

{¶104} We address appellant's very cursory assertions in turn. First, trial counsel's decision to rely on cross-examination rather than calling a defense DNA expert was not ineffective. "Counsel's failure to retain an expert does not necessarily constitute deficient performance." *State v. Mallory*, 11th Dist. Trumbull No. 2020-T-0070, 2021-Ohio-1542, ¶ 42, citing *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). Counsel effectively and thoroughly cross-examined Altizer. Moreover, appellant has not suggested how or why this decision to not call an independent DNA analyst caused prejudice. Indeed, appellant admitted that he owned the knife and other items with Ruffo's blood on them. Appellant argued that he acted in self-defense, which would accord with Ruffo's DNA being on those items.

{¶105} Second, nothing in the record supports appellant's claim that his trial counsel failed to meet with him to review the case.

{¶106} Finally, the decision to not subpoena witnesses is a matter of trial tactics and we will not second guess trial counsel's decision. *State v. Kovacic*, 2012-Ohio-219,

29

969 N.E.2d 322, ¶ 46 (11th Dist.). Appellant has not suggested that the that the testimony of a missing witness would have benefitted his defense or how the failure to call another witness caused him prejudice. *See State v. Beesler*, 11th Dist. Ashtabula No. 2002-A-0001, 2003-Ohio-2815, ¶ 13.

{¶107} Accordingly, appellant's fifth assignment of error is without merit.

{¶108} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J.,

MARY JANE TRAPP, J.,

concur.

Case No. 2021-A-0015