[Cite as *State v. Rose*, 2022-Ohio-4041.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

JOHN R. ROSE,

        Defendant-Appellant.

CASE NO. 2022-A-0040

Civil Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00226

---

**O P I N I O N**

Decided: November 14, 2022
Judgment: Affirmed

---

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Jessica Fross*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Wesley A. Johnston*, P.O. Box 6041, Youngstown, OH 44501 (For Defendant-Appellant).


JOHN J. EKLUND, J.

{¶1} Appellant, John Rose, appeals the denial of his request for a new trial and for postconviction relief from the Ashtabula County Court of Common Pleas. Appellant was convicted of Aggravated Murder, in violation of R.C. 2903.01(A).

{¶2} Appellant raises a single assignment of error asserting that the trial court erred in denying his request for a new trial without holding a hearing after appellant had presented evidence to support his claims.

{¶3} After review of the record and the applicable caselaw, we find appellant's assignment of error to be without merit. The trial court appropriately exercised its

discretion to not hold a hearing for postconviction relief when it determined that appellant failed to present substantive grounds for relief.

{¶4} Therefore, we affirm the judgment of the Ashtabula County Court of Common Pleas.

**Substantive and Procedural History**

{¶5} In June 2020, appellant was indicted by the Ashtabula County Grand Jury. He was charged with: Count One: Aggravated Murder in violation of R.C. 2903.01(A), an unclassified felony; Count Two: Murder in violation of R.C. 2903.02(A), an unclassified felony; Count Three: Murder in violation of R.C. 2903.02(B), an unclassified felony; and Count Four: Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the second degree.

{¶6} Appellant pled not guilty and a jury trial was held. At trial, the State presented ten witnesses, including that of appellant's wife, Marie Rose. Appellant testified on his own behalf.

{¶7} When the State called Marie Rose, the prosecutor stated on the record, "I would bring to your attention that – and we discussed this briefly yesterday – I have spoken to Marie Rose. There were people present when some statements were made to her by the Defendant, and I will lay a foundation to that before I ask what was said."

{¶8} Marie Rose testified that appellant lived with her in the same residence. She said that on the date of Paul Ruffo's death, she lived at her house with appellant, her children, her ex-boyfriend Edward Becker, Jerry McRoberts, Gabby Reo, and Rachael Clevenger.

2

Case No. 2022-A-0040

{¶9}   The prosecutor asked if appellant had ever talked to Marie Rose about Ruffo. She answered that he did. The prosecutor asked if anybody else was present during those conversations. She said that Becker was present for one of those conversations in late May or early June of 2020. The prosecutor asked what was said and Marie Rose said that appellant did not like Ruffo because Clevenger "was always going to his house." According to Marie Rose, appellant said that if Ruffo keeps giving Clevenger heroin, "that he's going to harm him in a way, hmm basically, just not if Rachael's over there. And he, ah, he kept saying that he was going to hurt him if he kept giving her drugs, giving her H, heroin." Marie Rose testified that appellant said he was going to kill Ruffo. The prosecutor asked again, "were there other people around when [appellant] said that?" Marie Rose said, "my ex-boyfriend, Edward [Becker]."

{¶10}   Marie Rose said that appellant left the house on June 2 and later returned around 2:00 am on June 3. She said that when appellant returned home, Becker was in the room with her as well. She said that appellant came into the bedroom and said "I think I screwed up this time. Um, I think I -- I might have killed him. I'm pretty sure that what he said." Trial counsel objected to this line of questioning and the trial court overruled the objection. In closing arguments, the State characterized Marie Rose's testimony as "very powerful."

{¶11}   The State introduced evidence of the 911 call that Rachael Clevenger made calling for an ambulance. In the call, Clevenger is distraught and unable to state the nature of the emergency.

{¶12}   The State called Deputy James Lewis from the Ashtabula County Sheriff's Office. The State also admitted body camera footage from Lewis while he was at the

3

scene. Lewis testified that on June 2, 2020, he arrived at the crime scene and saw Clevenger screaming for help. Lewis saw blood at the scene outside and found Ruffo laying in the bathtub with blood on his left side. He said Clevenger was "panicky and shaken up" and stated that Ruffo had been stabbed.

{¶13} Clevenger told Lewis that appellant stabbed Ruffo and that he was wearing camouflage shorts with construction boots and a green t-shirt. She said that she did not see appellant stab Ruffo, but that Ruffo and appellant stepped outside to talk and that Ruffo came back inside after being stabbed.

{¶14} Lewis took a series of photographs of the scene depicting the location of blood in the front yard, on the sidewalk and stairway to the porch, on the front porch, and the doorway. A drink lid and a green t-shirt were also found outside with blood on them. Finally, Lewis testified that Clevenger had died of a drug overdose prior to trial.

{¶15} The State next called Thomas Ricker, who responded as a paramedic to the scene. He said that when he arrived, he evaluated Ruffo, removed him from the home and determined that he had no heartbeat, was no longer bleeding from his wound, and had fixed pupils. After consulting with Dr. Kehrer from the Geneva Emergency Room, it was determined that Ruffo was deceased.

{¶16} The next witness was Dr. Evan Howe, a deputy coroner from the Ashtabula County Coroner's Office. Howe determined that Ruffo's cause of death was a stab wound to the chest and the manner of death was homicide.

{¶17} The State called Dr. Joseph Felo, a forensic pathologist from the Cuyahoga County Medical Examiner's Office. Felo said that one of his subordinates, Dr. Elizabeth Mooney conducted Ruffo's autopsy. Felo testified as to Mooney's findings in her autopsy

4

report. He said that Ruffo had four sharp injuries caused by a knife on his body. One stab wound into his chest, which was fatal, and three other sharp injuries on his left upper arm. He also had fresh scattered blunt trauma on his body including abrasions and contusions.

{¶18} Next, the State called Deputy Leonard Emch of the Ashtabula County Sheriff's Office. Emch stated that he went to appellant's residence after the stabbing. Emch encountered Marie Rose. Emch found appellant in a locked bedroom and arrested him. Appellant admitted to being at Ruffo's residence and said that Ruffo "clotheslined" him off the porch after an altercation. He said that he went home after this and denied having any weapons at the time. When Emch arrested appellant, he was wearing a white t-shirt, camouflage pants, and a brown belt. He admitted that he left a green shirt and hat at Ruffo's residence. Deputies recovered a number of knives and sharpening stones in appellant's room.

{¶19} Lieutenant Bryan Rose testified that he knew Ruffo through prior contact with him and that Ruffo did not have a reputation for violence. Lieutenant Rose was present when deputies arrested appellant. He said that appellant admitted that he always carried a pocketknife but that he did not know where it was at the time of his arrest.

{¶20} Detective Sean Ward testified he investigated Ruffo's murder. He said that based on the condition of the scene, that he believed Ruffo was stabbed in the yard and that he walked up the porch steps to the house while projecting blood on the siding. He said that the majority of the blood was on the left side of the steps, indicating that Ruffo walked up the steps while bleeding.

{¶21} Ward interviewed appellant on June 3. Appellant told Ward that Ruffo was the aggressor in the situation. Appellant did not admit to having a knife and denied

5

causing harm to Ruffo. Appellant told Ward that Ruffo clotheslined him over the porch. Ward said that he observed no disturbances on the ground that would indicate Ruffo clotheslined appellant over the railing of the porch. In the interview, appellant denied knowing how Ruffo was stabbed but suggested that Ruffo injured himself falling over the railing of the porch or that Clevenger stabbed him.

{¶22} On June 4, Ward executed a search warrant to obtain appellant's DNA. During that process, appellant asked to speak with Ward again. Ward conducted a second interview with appellant.

{¶23} In the second interview, appellant said that he was concerned about drug activity at Ruffo's house and was concerned about Clevenger's involvement with Ruffo. Appellant said that he went to the house and talked to Clevenger on the front porch. Clevenger went inside and Ruffo came out. Appellant admitted that he did have a knife on him. He said that Ruffo rushed him and the two went over the porch railing. He told Ward that he could show him where he discarded the knife. He did not say whether Ruffo was armed. He told Ward that he "wasn't trying to defend anybody."

{¶24} Ward then transported appellant to the location where he discarded the knife. On the way to recover the knife, appellant again changed his story and said that he had discarded two knives. One, a green handled knife that belonged to him, and the second was a knife that belonged to Ruffo, which appellant had taken before leaving the scene. Appellant indicated the location where he had thrown the knives and deputies were able to recover appellant's green handled pocketknife. The following day, a concerned citizen reported that they had found a knife in the area where appellant's green handled knife was recovered. Ward stated that the two knives were similar style knives.

6

{¶25} Ward also obtained appellant's Facebook records which contained messages from appellant to Clevenger. In a message sent June 1, the day before Ruffo was stabbed, appellant told Clevenger that "Ahhh, Mr. racoon eyes something coming and it looks like it's going to happen at his work, how long did u think it was gonna be be4 I found out? I also have his address! May as well tell him goodbye." In another message he said "I love u rachael don't make me see that something happens to Mr. Racoon eyes u know it won't take much! U need to stop your nonsense." On June 2, the day of Ruffo's death, appellant told Clevenger that "Raccoon eyes is a dead motherf*****!" Appellant also told Clevenger that "Im getting pissed who you f***** with cuz if I catch you with some1 else u know what's going to happen." In another message mere hours before Ruffo was stabbed, appellant sent a message that said, "I don't care who the f***'s there, Ill waste everybody."

{¶26} Ward also reviewed Ruffo's personal cell phone and found messages between Ruffo and appellant. In one message four days prior to the stabbing, appellant sent Ruffo a message that said "Ill be over in a few then ill be back every hour on the hour hope I'm not met with resistance. Like I said kill or die for her." In another message sent three days before Ruffo died, appellant said "We'll be back over with a few more cats to party on your porch you don't mind do you…… Didn't think so …. Maybe you shouldn't lie to people and feed heroin to rachael just because it's the only possibility of having your way with her. When we get back we're walking right in and if Im satisfied she's not there Ill apologize and walk away but it she is there Im gonna be pissed but I already know." On June 2, the day of Ruffo's death, appellant sent Ruffo a message that said "U sorry son of a b**** i can't even tell you how f****** up sh*** about to be. If I were u I wouldn't

7

even want to be in that f****** house. * * * Watch out mother***** your f****** through pimp daddy." Appellant sent other similar threatening messages directly to Ruffo in the days leading up to the stabbing. Ruffo did not reply to these messages.

{¶27} The State next called Julie Altizer, a forensic scientist at the forensic and biology section of the Bureau of Criminal Investigation (BCI). She testified that she analyzed the DNA evidence in this case, including samples from a green t-shirt, camouflage pants, and a green knife. Altizer said that she found blood belonging to Ruffo on each of these items.

{¶28} The State rested and appellant testified on his own behalf. He admitted that he sent the Facebook and text messages about Ruffo but said that he was intoxicated when he sent the messages and often said things while intoxicated that he did not mean. He said that his true intention was to threaten to call the police and report that Ruffo was operating a drug house.

{¶29} Appellant testified that he and Clevenger had a feud two days prior to Ruffo's death and that Clevenger left to stay at Ruffo's house. Appellant said that Clevenger would often go to Ruffo's house to get heroin. Appellant said that Clevenger's heroin use bothered him and that he did not like when she obtained heroin from Ruffo. He said that on June 2, Clevenger messaged appellant and he went to Ruffo's house to pick her up.

{¶30} Appellant said that he talked to Clevenger on the porch and that she went inside to gather her belongings. Appellant said that Ruffo came out to the porch with a knife in his hand. The two exchanged words and Ruffo ran at appellant and the two went over the porch railing and started wrestling. Appellant said he had no idea that he stabbed

8

Ruffo during the encounter. He said that "I shoved and kicked him off -- my knife was open, but I shoved and kicked him off, and I grabbed his knife because I didn't want another chance to get skinned. You know? I was scared." He said he fled the scene because he did not want to be labeled as a snitch. Initially, appellant did not believe that he had seriously harmed Ruffo. He said that all he tried to do was shove Ruffo off him, which was "the only way he could have got stuck." He said that he at first refused to believe that he could have stabbed Ruffo in self-defense and did not want to believe he was responsible. He said that he came to believe that he "must have" stabbed Ruffo during their scuffle on the ground because "there's no other possibility." Appellant acknowledged that he lied to Detective Ward in his first interview with him by saying that he did not have a knife.

{¶31} The trial court instructed the jury on self-defense and the jury found appellant guilty on all counts. The trial court found that Counts Two, Three, and Four merged with Count One for purposes of sentencing. The court sentenced appellant to life in prison without the possibility of parole.

{¶32} Appellant timely filed an appeal in *State v. Rose*, 11th Dist. Ashtabula, 2021-A-0015, 2022-Ohio-3197. We affirmed appellant's conviction in that case and found that the trial court committed plain error by allowing Marie Rose to testify without first making an affirmative determination on the record that Marie Rose had elected to testify. However, we also concluded that this error was harmless and that the outcome of the trial would not have been different without Marie Rose's testimony.

9

Case No. 2022-A-0040

{¶33} On March 11, 2022, during the pendency of his direct appeal, appellant filed a pro se motion for leave to file for a new trial. On March 21, 2022, appellant filed a motion in limine for a new trial. On April 7, 2022, appellant filed a petition for postconviction relief.

{¶34} In his motion, Appellant argued that he had obtained newly discovered evidence from his children, Brian Rose and Sharon Rose. Appellant attached affidavits from the two which stated that Detective Ward and Marie Rose had colluded to present false evidence implicating appellant. Brian Rose's affidavit stated that Marie Rose had lied in her testimony about appellant and that he did not share this information sooner because he feared his mother. Sharon Rose's affidavit similarly stated that appellant did not talk to Marie Rose on the night of the murder. Sharon Rose also stated that she "never heard my dad make statements to my mother or anyone else that he wanted to kill Paul Ruffo or anyone else."

{¶35} In addition, appellant submitted his own affidavit stating that he had recently discovered that Brian Rose had evidence that his mother had lied. Appellant also said that "Rachel Clevenger stabbed and killed Paul Ruffo and although I may have been tempted to take the blame, that was because, at the time, Rachel was the love of my life and I wanted to protect her from harm. I was denied my right to testify at trial substantively as to what actually occurred by repeated sustained objections as to that testimony. Had I testified fully, it would have been as above."

{¶36} On April 14, the trial court overruled appellant's motions without a hearing. In its judgment entry, the trial court noted that it treated appellant's motions as motions for postconviction relief because appellant had filed the motions while he had a direct appeal pending. The court said that appellant's

10

argument is spurious. In this case, the Defendant took the stand in his own defense. He testified about the fight between himself and Ruffo. His testimony did not include anything about Clevenger stabbing Ruffo to death. Therefore, it is the Defendant's argument that he either committed perjury at trial, or he plans to commit perjury at a new trial based upon this dubious affidavit. Further, the Defendant could have learned of the existence of Brian's testimony prior to trial. Brian is his son, and Marie Rose was cross-examined at trial.

{¶37} Appellant timely appealed the trial court's denial of his motion for post-conviction relief.

## Assignment of Error and Analysis

{¶38} Appellant's first assignment of error states:

{¶39} "[1.] THE TRIAL COURT ERRED WHEN IT OVERRULED ROSE'S PETITITION FOR POST-CONVICTION RELIEF WITHOUT A HEARING."

{¶40} Appellant argues that the trial court abused its discretion by denying his motion for postconviction relief without a hearing. He believes that his motion raised constitutional violations warranting relief, that he presented sufficient operative facts and evidence from outside the record that merit a hearing, and that he was unavoidably prevented from discovering or raising these claims sooner. Appellant says that had he been able to present these claims sooner, no reasonable fact-finder would have convicted him of murder.

{¶41} We review a trial court's decision on a petition for postconviction relief under R.C. 2953.02 for an abuse of discretion. *State v. Hobbs*, 11th Dist. Lake No. 2010-L-139, 2011-Ohio-5106, ¶ 14.

{¶42} "'The term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record.' *State v. Underwood*, 11th

11

Dist. Lake No. 2008-L-113, 2009-Ohio-208 [2009 WL 1177050], ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678 [148 N.E. 362] (1925)." *State v. Raia*, 11th Dist. Portage No. 2013-P-0020, 2014-Ohio-2707, ¶ 9. Stated differently, an abuse of discretion is "the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" *Id.*, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004). "When an appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.'" *Id.*, quoting *Beechler* at ¶ 67.

{¶43} R.C. 2953.21 provides, in relevant part:

(A)(1)(a) Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

* * *

(D) The court shall consider a petition that is timely filed within the period specified in division (A)(2) of this section even if a direct appeal of the judgment is pending. Before granting a hearing on a petition filed under division (A)(1)(a)(i), (ii), (iii), or (iv) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the

12

clerk of the court, and the court reporter's transcript. The court reporter's transcript, if ordered and certified by the court, shall be taxed as court costs. If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal. If the petition was filed by a person who has been sentenced to death, the findings of fact and conclusions of law shall state specifically the reasons for the dismissal of the petition and of each claim it contains.

* * *

(F) Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues even if a direct appeal of the case is pending. If the court notifies the parties that it has found grounds for granting relief, either party may request an appellate court in which a direct appeal of the judgment is pending to remand the pending case to the court.

{¶44} When a trial court dismisses a petition for postconviction relief, it is mandatory for the court to issue findings of fact and conclusions of law. R.C. 2953.21(D); *State v. Calhoun*, 86 Ohio St.3d 279, 291, 714 N.E.2d 905 (1999). The findings of fact and conclusions of law "need not discuss every issue raised by appellant or engage in an elaborate and lengthy discussion in its findings of fact and conclusions of law." *Id.* The findings need only be comprehensive and pertinent to the issues presented in the petition and provide a basis of support for the court's conclusion. *Id.* at 291-292.

{¶45} "A petition for postconviction relief does not provide a petitioner a second opportunity to litigate his or her conviction." *State v. Hobbs*, 11th Dist. Lake No. 2010-L-139, 2011-Ohio-5106, ¶ 17, citing *State v. Hessler*, 10th Dist. Franklin No. 01AP-1011, 2002-Ohio-3321, ¶ 23. "The doctrine of res judicata establishes that 'a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal *from that judgment,* any defense or any claimed lack of due process

13

**{¶46}** that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.'" *State v. D'Ambrosio*, 73 Ohio St.3d 141, 143, 652 N.E.2d 710 (1995) (emphasis sic), quoting *State v. Perry*, 10 Ohio St.2d 175, 180, 226 N.E.2d 104 (1967).

**{¶47}** Appellant must provide competent, relevant, and material evidence outside of the trial court record in support of a postconviction petition to prevent the claim from being dismissed on res judicata grounds. *State v. Lacy*, 11th Dist. Ashtabula No. 2019-A-0058, 2020-Ohio-1556, ¶ 26, citing *Hobbs* at ¶ 18.

**{¶48}** Next, "postconviction relief petitions are subject to dismissal without a hearing if the petition and the supporting evidentiary documents do not contain sufficient operative facts which, if true, would establish substantive grounds for relief." *State v. Hull*, 11th Dist. Lake No. 2018-L-050, 2019-Ohio-23, ¶ 31, quoting *State v. Apanovitch*, 113 Ohio App.3d 591, 597, 681 N.E.2d 961 (8th Dist.1996), citing *State v. Sowell*, 73 Ohio App.3d 672, 682, 598 N.E.2d 136 (1991); *State v. Calhoun,* 86 Ohio St.3d 279, 714 N.E.2d 905 (1999). "The trial court has a duty to ensure that the petitioner adduces sufficient evidence to warrant a hearing." *State v. Vinson*, 11th Dist. Lake No. 2007-L-088, 2008-Ohio-3059, ¶ 30, quoting *State v. Delmonico*, 11th Dist. Ashtabula No. 2004-A-0033, 2005-Ohio-2882, ¶ 13.

**{¶49}** Although a trial court should give deference to sworn affidavits filed in support of the petition, the court may nevertheless exercise its sound discretion by "determining whether to accept the affidavits as true statements of fact." *Calhoun*, *supra*, at 284. This is because R.C. 2953.21 "clearly calls for discretion in determining whether

14

to grant a hearing, accepting all supporting affidavits as true is certainly not what the statute intended." *Id.*

**{¶50}** In determining the credibility of supporting affidavits in postconviction relief proceedings, the trial court should consider the following factors:

> (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.

*Id.* at 286.

**{¶51}** "Depending on the entire record, one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility." *Id.*

**{¶52}** Here, the trial court's judgment entry sufficiently set forth its basis for dismissing appellant's petition without a hearing. The court characterized appellant's arguments as "spurious." The judge reviewing the petition was the same judge that presided over the trial. The trial court noted that two of the affiants were appellant's children and that the defenses presented through their testimony could have been raised at appellant's trial.

**{¶53}** The trial court also concluded that appellant's affidavit claiming that Clevenger stabbed Ruffo is in direct contradiction to his trial testimony. At trial, appellant testified that Clevenger was inside the house when Ruffo lunged at him with a knife.

15

Appellant testified that Ruffo clotheslined him and that the two scuffled on the ground. Appellant said that he acted in self-defense and, based on that testimony, the trial court gave the jury a self-defense instruction.

{¶54} Appellant asserts that his substantive right to testify was impaired because he was unable to raise his defense in his jury trial. This argument is not convincing. Appellant's trial testimony was sufficiently free for him to present a competent defense and to convince the trial court to give a self-defense jury instruction.

{¶55} Moreover, appellant's affidavit insinuates that he did not wish to implicate Clevenger in the murder because, "at the time, Rachel was the love of my life and I wanted to protect her from harm." While this could explain why appellant would not be truthful during the investigation, it does not similarly explain why appellant would not reveal this during his testimony at trial. Clevenger was deceased by the time of appellant's trial. Therefore, there was no "harm" that appellant could protect her from by withholding her involvement.

{¶56} We agree with the trial court that appellant either perjured himself during his trial or that his intent is to perjure himself at a new trial based on the information he provided in his affidavit. Appellant failed to present competent, reliable, and material evidence that appellant could not have presented at his murder trial. Therefore, the trial court properly exercised its discretion to dismiss appellant's petition for postconviction relief without a hearing.

{¶57} Accordingly, appellant's sole assignment of error is without merit.

16

{¶58} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed.


MARY JANE TRAPP, J.,

MATT LYNCH, J.

concur.